[Civ. No. 12143. Second Appellate District, Division One.—May 6, 1940.]

JAMES E. WILSON, Respondent, v. McCORMICK STEAM-SHIP COMPANY (a Corporation), Appellant.

Lasher B. Gallagher for Appellant.

Herbert R. Lande for Respondent.

WHITE, J.—This is an appeal from a judgment for plaintiff entered upon the verdict of a jury in an action for damages for personal injuries alleged to have been sustained by plaintiff in the course of his employment as a seaman, resulting from a fall through an open hatch into the hold of the ship owned by his employer, the defendant company. The action was brought pursuant to the provisions of the Jones Act (46 U. S. C. 688), which extends to a seaman the right to recover in an action at law for injuries sustained in the course of his employment and resulting in whole or in part from the negligence of any officers, agents or employees of the employer or by reason of any defect or insufficiency in its equipment. (See Federal Employers' Lia-

bility Act, 45 U. S. C; *Paulsen* v. *McDuffie*, 4 Cal. (2d) 111 [47 Pac. (2d) 709].)

In general, the facts are that at the time of his injury, on December 18, 1937, plaintiff was working on the steamship Point San Pablo, owned by the defendant, and which was docked at Los Angeles harbor. About 7 o'clock on that evening the chief mate directed plaintiff to "go forward and get lanterns and hang them upon the bow and on the stern". In obedience to this order, plaintiff went forward, with the aid of a flashlight, because the deck was in total darkness. He walked over the deck load to the forecastle head, then down the ladder on the port side to the passageway between what was designated as No. 1 hatch and the forecastle. Plaintiff tried the switch for the lights in the fore and aft passageway, but the lights did not burn. He then went to the lamp locker in the forecastle and tried the lights there, without success. He then took two or three lanterns out of the locker, lighted them, put his flashlight in his back pocket, picked up the lanterns and proceeded down the fore and aft passageway, intending to go to the peak of the forecastle head, where he had been ordered to place a lantern. Four iron bars, known as "sealing bars", rounded on one side and flat on the other, and which are used in fastening down the hatch covers when the ship puts to sea, had been removed from the hatch and laid in the passageway. On the night plaintiff was hurt the No. 1 hatch into which he fell was open and there were no guard ropes placed around the same, although on previous occasions the former chief mate had rigged a guard line around this hatch when it was open while the ship was in port. What occurred at the time and immediately preceding the accident may be epitomized in the following quotation from plaintiff's testimony: "As I walked out of the fore and aft passageway, in turning to my right, I stepped up on top of these sealing bars, and slipped and fell into the lower hold of No. 1 hatch. . . . They" (the sealing bars) "were about twelve inches above the deck. . . . My feet slipped and I lost my balance and I fell backwards into No. 1 hold. . . . The sealing bars moved underneath my feet. . . ." As a result of the accident plaintiff sustained injuries which were diagnosed as "Fracture of skull, probably depressed. Second, fracture, 8th, 9th and 10th ribs. Third, Fracture lumbar vertebra."

In its answer defendant denied negligence on its part as well as the existence of any unsafe or dangerous condition; and as separate defenses alleged, first, that plaintiff's injuries were proximately caused by his own negligence, and second, that in consideration of payment of the sum of $1250, plaintiff had executed a release of all claims. A copy of such release was annexed to the answer. Trial was had before a jury, which returned a verdict in favor of plaintiff for the sum of $1500 in addition to the $1250 received by plaintiff pursuant to the terms of the release. Following the denial of its motion for judgment notwithstanding the verdict and for a new trial defendant steamship company prosecutes this appeal from the judgment entered upon the verdict.

As its first ground of appeal appellant asserts that under the provisions of section 448 of the Code of Civil Procedure the ''genuineness and due execution'' of the release were admitted by plaintiff when he failed to file ''an affidavit denying the same'', and that he·was therefore precluded from seeking to avoid the legal effect of the instrument by evidence that he was mentally incompetent at the time he signed it. The authorities do not support appellant's contention in this regard. (*Gajanich* v. *Gregory,* 116 Cal. App. 622 [3 Pac. (2d) 389]; *Moore* v. *Copp,* 119 Cal. 429, 432 [51 Pac. 630]; *McKenzie* v. *Los Angeles Life Ins. Co.,* 97 Cal. App. 659 [275 Pac. 1003]; *Baird* v. *Pacific Elec. Ry. Co.,* 39 Cal. App. 512 [179 Pac. 449]; *Martin* v. *Postal Union Life Ins. Co.,* 16 Cal. App. (2d) 570 [61 Pac. (2d) 333].) As was said in *Gajanich* v. *Gregory, supra,* ''The above section provides that when the defense to an action is founded upon a written instrument, and a copy thereof is contained in the answer, the genuineness and due execution of such instrument are deemed admitted unless the plaintiff file with the clerk within ten days after receiving a copy of the answer an affidavit denying the same, and serve a copy thereof on the defendant. It has been held that by the use of the term genuineness is meant that the document pleaded is the identical instrument which it purports to be, and that it appears in the exact form in which it passed between the parties; and that the admission of its due execution means only that it was regularly signed and delivered in the form in which it appears . . . Nor do these admissions preclude a

party from challenging the effect of the instrument on the grounds of fraud or mistake; and under section 462 of the Code of Civil Procedure such defenses need not be pleaded by way of replication. . . . '' Therefore plaintiff was not estopped from introducing evidence to the effect that although he signed the release, nevertheless the same was not fairly made with him nor fully comprehended by him, and that the instrument was therefore void.

If it be found that the release given by plaintiff to the defendant steamship company is valid, then such finding is determinative of all other issues raised. Respondent attacks the validity of the release in question on the ground that the same was not fairly made with nor fully comprehended by him. With reference to the circumstances surrounding the execution of the release, plaintiff testified that following the accident on December 18, 1937, he remained at the Seaside Hospital in Long Beach until January 21, 1938, when he was transferred to the San Francisco Marine Hospital; that the physicians at the Long Beach hospital told him that he had just a few fractured ribs and there was nothing to worry about; that when he came to the San Francisco hospital he was in severe pain, his head felt heavy and dizzy, he could not distinguish things clearly and he had a severe pounding pain in his head; he could not concentrate on reading because of severe pains in his head. He did not leave his bed until about two weeks before his discharge from the hospital. The day of his discharge, February 21, 1938, was four days after he was first able to walk away from his bed unsupported. The longest time he was on his feet was the day before his discharge, when he was up about two hours. During the time he was ''learning to walk'' he was in severe pain. He was in a forward stooped position, had severe headaches, pains, pounding in his head and everything hazy in front of his eyes. He was unable to read consistently and could not read whole paragraphs of print. He was told at the Marine Hospital that his injuries were getting better, but was not told the extent of his injuries.

On February 21, 1938, plaintiff left the Marine Hospital and took a street car to the law office where he signed the release. He testified: '' . . . I was very weak yet, and I was suffering from pain in my back and also in my head,

and I could only walk very slow, and I had to stop several times and . . . rest . . . My legs were very weak and it seemed like they would not hold my weight. . . . The traffic made me dizzy and everything went hazy in front of my eyes." He had a "terrific pain" in his back from sitting on a hard wooden bench in the office of the lawyer where he signed the release. He talked to Mr. Fricke (a representative of defendant company) about fifteen minutes, then went out and had some breakfast, and returned and had a conversation. "Mr. Fricke asked me what I wanted, and I told him I wanted sufficient money to go home and live on until I was able to return to work. . . . I told him I wanted $1500. And he said, you are kind of high. But, he said, I will take the subject up with Mr. Black, and you come back at two-thirty in the afternoon." Plaintiff testified that during this conversation he "was suffering from severe pain in my back and shoulders". "It increased all the time." At 2:30 plaintiff had another conversation with Mr. Fricke. "Mr. Fricke then told me that Mr. Black would give me a thousand dollars, and that I would be able to live on that sum as I would be able to go home to San Pedro then. I said, 'Well, I guess I will have to take it, because I am broke and have to have money for my wife and myself.' " Plaintiff further testified that he did not read the release before he signed it; that at the time he signed it he was suffering from severe pain in the back and shoulders and a severe pounding and headache in his head; that he "could not think very clearly"; that the extent of his injuries was not discussed with Mr. Fricke. Plaintiff further testified that upon his return to San Pedro he received treatments at the United States Public Health Service for about three months and wore a brace for his back; about March 29th he fainted and was returned to the Seaside Hospital for two nights and a day; that in May he went to a Dr. Brown, who took X-rays and fitted him with another brace which extended the entire length of his back and held him in a rigid upright position; that going about without the brace made him weak and gave him pains in the back.

It further appears in the evidence that on June 23, 1938, approximately a month after he filed the complaint herein, plaintiff obtained from the United States Department of Commerce a certificate rating him as an able-bodied seaman.

During his cross-examination plaintiff admitted that in his application for such certificate he represented to the authorities that he was in good physical condition and able to perform the duties of an able-bodied seaman. It was also shown that in June he worked on a ship, and that in July he was employed upon another vessel, making a trip from Los Angeles to the Hawaiian Islands and from there to San Francisco.

Expert testimony was presented by a physician skilled in the treatment of nervous and mental diseases who pronounced the plaintiff as suffering from what is termed an "anxiety neurosis", described by the doctor as "a state of mind which has been caused by a definite psychic or organic lesion of the brain, in contra-distinction to an anxiety state, which anyone may have, if the appropriate situation presents itself. In other words, an anxiety neurosis is more or less of a chronic situation, while an anxiety state is not. The symptoms are the same, but they are intensified and prolonged in the anxiety neurosis." Answering a hypothetical question embodying plaintiff's condition and the circumstances surrounding the execution of the release, the physician testified as follows:

" . . . The Court: That is not the question. The question is: Did he understand what he was doing?

"A. Not to the fullest extent. It is well known that a person who is suffering from dizziness and headaches and general fatigue does not have full charge of all his mental faculties, and is unable to arrive at an answer which would be in keeping with his normal mental state when he was not ill. Also a conclusion reached while under such symptoms would depend a great deal upon the patient's knowledge of the situation, which would undoubtedly be somewhat influenced by the symptoms that he had at that time."

Defendant introduced evidence to the effect that plaintiff was normal at the time he executed the release in question. It appears without contradiction that the activities looking toward a settlement of plaintiff's claim against defendant company were initiated by the former. On February 12th and 17th he wrote letters to defendant's attorney in that regard, the first of which reads as follows: "Mr. J. H. Black. Dear Sir: Writing to you and would like to have an advance on my account and need a $150, as I want to send home to

my wife a $100 and the rest to get an outfit of clothes so I can get out of hospital and come to your office. I have been in past a favor to your good office on two cases, one from the S/S Charles L. Wheeler and S/S Ernest H. Meyers. I have no intention of bringing lawsuit on my accident. I know we will be able to come to terms. Hopeing I can have the amount stated this week''; and the second one reading: ''I am writing again to find out why I haven't heard from you in person or an answer to my last letter. I am leaving the hospital Monday, I can get some dress clothes to go with. That is why I ask for $150 advanced to my account pending settlement with your office. Mr. Black, I have wanted to settle my case with you and I do wish this could be taken care of. I will be an out-patient for treatments at San Pedro, where I shall go when I leave here. I shall expect to hear from you tomorrow.'' Four days later the release was signed. The last-mentioned document is captioned with large-size type reading: ''Do not sign this unless you fully understand its contents—this is a full release of all claims and demands''; and following the signature of plaintiff upon the release the following appears: ''Do you understand that signing this paper settles and ends every claim for damages, as well as for compensation, maintenance, cure and wages?'' In the blank space following the word ''Answer'' plaintiff wrote, ''Yes.''

Respondent contends that the evidence herein narrated shows that he suffered from a brain concussion at the time of his injury December 18, 1937, was hospitalized until the day upon which he signed the release, during all of which time he was afflicted with severe headaches, was unable to concentrate on any one subject for any length of time, and when standing upon his feet was subject to dizzy spells. This, respondent asserts, constitutes evidence of sufficient substantiality to support the implied finding of the jury that the release was not fairly made and was invalid.

In attacking the validity of the release respondent reminds us of his position as a mariner and therefore, so to speak, a ward of the court of admiralty, ''whose rights are tenderly guarded and whose acts, when waiving or yielding his rights, are carefully scrutinized''. He invokes the rule stated in *Riegel* v. *Higgins* (D. C), 241 Fed. 718, 722, and elaborated in the *Henry S. Grove* (D. C.), 22 Fed. (2d) 444,

466, as follows: "Releases by seamen are never conclusive, except when made knowingly and intentionally, and with a full understanding of the situation.' This being true, the doubt should be resolved in favor of the libelant. A court should be slow to hold that a release becomes operative as to a matter of liability of which the releasing party may have been in ignorance, and which, in fairly interpreting the document, was not in contemplation of the parties when it was made. (*Tug Ross Coddington,* 40 Fed. (2d) 280, 1924 A. M. C. 615.) "

We have discussed this matter at some length because of our concern or responsibility for seamen in cases of this nature. We are not unmindful that a release of this kind is not a bar preventing inquiry into the seaman's rights. As was said by the Third Circuit Court of Appeals in the case of *The Adonis,* 38 Fed. (2d) 743, "it can always be looked into. . . . " (Citing cases.) " . . . But a release of this kind, formally signed, sealed, and witnessed, is, however, *prima facie* good, and cannot be set aside unless it was obtained by duress, mistake, or, in this case, by fraud, . . . " Before courts will set aside solemn binding written contracts, proof of their invalidity must be clear and convincing. Were the rule otherwise, a written instrument would afford but slight protection to the parties.

In the instant case there can be no doubt but that plaintiff conceived the idea of settling his claim or demand against the defendant, for in his first letter he wrote, "I have no intention of bringing lawsuit on my accident, I know we will be able to come to terms"; and again in his letter of February 17th he clearly indicates his intentions and desires by the use of the following language: "I have wanted to settle my case with you and I wish this could be taken care of." Coming now to a consideration of the facts and circumstances just preceding and at the time of the execution of the release, we find that respondent was discharged from the hospital that morning, whereupon he immediately sought defendant's agent, Mr. Black. Departing from the hospital at 8:30 o'clock A. M., he walked four blocks to the car line, waited for seven or eight minutes on the street corner until the right car came along, got on it, and stood up on the moving street car for some twenty minutes. He then alighted in downtown San Francisco and walked directly to the proper address of de-

fendant's counsel on Sansome Street, got into an elevator and went directly to the office of Mr. Black, arriving about 9:30 o'clock. He thereupon talked with Mr. Fricke, an associate of Mr. Black, for about fifteen minutes, and then left by himself, went down upon the street to a restaurant, obtained his breakfast, and again went back to Mr. Black's office, arriving at about 11:30 A. M., at which time he had a further talk with Mr. Fricke. Upon this last-named occasion he told Mr. Fricke he wanted $1500 to settle his claim, and Mr. Fricke said that in his opinion the amount was high, but he would take the subject up with Mr. Black, and suggested respondent return at 2:30 in the afternoon. Respondent then went down on Market Street, obtained something to eat, and returned at about 2:30 to Mr. Black's office. Upon this occasion Mr. Fricke told respondent that the company would give him $1,000, whereupon respondent stated, in effect, that he guessed he would have to take it, as he was broke and had to have money for himself and his wife. He then accepted the proffered release, signed his name thereto, and indicated by writing the word "yes" that he understood that the paper he signed was a full and complete settlement and adjustment of his claims against appellant. Following the execution of the release he went with a representative of appellant to the bank where the check was cashed, and the sum of $1,000 was delivered to respondent. Following his return to Los Angeles, it is true, he testified he continued to suffer from his injuries, but nevertheless it also appears that respondent was never licensed as an able-bodied seaman at any time prior to the accident, but between the time he received the $1,000 from appellant and June 23d he passed an official examination as to "eyesight, hearing and physical condition", and represented that he was in good physical condition and able to perform the duties of an able-bodied seaman, receiving a certificate authorizing him so to do.

Plaintiff's behavior and condition prior to and at the time the release was executed point unerringly to the conclusion that his physical and mental state was such that he formed in his own mind a determination to compromise his claim; that he fixed an amount for which he would settle; that he made the approach to appellant's representatives; that he negotiated with them, in which negotiations he asked

for $1500 and finally compromised for $1,000 plus $250 he had theretofore received; that he signed the release and accepted the money which passed in the transaction. There is neither evidence nor contention here that plaintiff could not read, but there is evidence in the record that he looked at the paper. He signed it; and the evidence falls far short of the amount required to overcome the presumption that he knew and understood its contents. Had respondent read the document in question he could not have been misled into believing it was anything short of a full and complete release. The record is totally bereft of any evidence that the appellant steamship company or its representatives did anything either to urge respondent to enter into negotiations for a settlement or to induce him to sign the release, or that appellant made any representations at any time to respondent that the document tendered for his signature was anything but a full and complete release and satisfaction of any and all claims asserted by him against appellant steamship company by reason of injuries received by respondent.

Therefore, considering the release here in question from the standpoint of the fairness of the conditions under which it was secured and of the settlement which it constituted, we find nothing unconscionable therein. The consideration which passed to the injured seaman under the terms of the settlement was not negligible or inadequate, considering the injuries sustained by him, when we remember that within a few months after the execution of the release plaintiff represented himself as an able-bodied seaman, satisfactorily passed a physical and mental examination for such rating, and was by the federal maritime authorities classified as such able-bodied seaman, thereafter entering upon employment in such capacity.

With reference to the position of both the seaman and his employer in the making of a settlement of this kind, the United States Circuit Court of Appeals of the Second Circuit, in the case of *Bonici* v. *Standard Oil Co. of N. J.*, 103 Fed. (2d) 437, 438, said:

"Hence, while 'one who claims that a seaman has signed away his rights to what in law is due him must be prepared to take the burden of sustaining the release as fairly made with and fully comprehended by the seaman' (*Harmon* v. *United States*, 5 Cir., 59 Fed. (2d) 372, at page 373), never-

theless a release fairly entered into and fairly safeguarding the rights of the seaman should be sustained. Any other result would be no kindness to the seaman, for it would make all settlements dangerous from the employer's standpoint and thus tend to force the seaman more regularly into the courts of admiralty. Even if a seaman is the court's ward, the court cannot be always at hand to watch over him, for it can only move ponderously in a formal lawsuit. Fair settlements are in the interest of the men, as well as of the employers.''

Because the release constitutes a full and complete defense to the action, a discussion or review of other points raised becomes unnecessary.

The judgment is reversed and the cause remanded, with directions to the court below to enter judgment for defendant notwithstanding the verdict.

York, P. J., and Doran, J., concurred.

A petition by respondent to have the cause heard in the Supreme Court, after judgment in the District Court of Appeal, was denied by the Supreme Court on July 1, 1940.