THOMPSON

v.

COASTAL OIL CO.

Civ. A. No. 1164-52.

United States District Court
D. New Jersey.

March 11, 1954.

**840**

Elmer C. Miller, By Silas Blake Axtell, John A. Gleason, New York City, for plaintiff.

Francis M. McInerney, Jersey City, By Michael E. Hanrahan, New York City, for defendant.

HARTSHORNE, District Judge.

Does a pot-pourri of homosexuality and attempted murder create an unseaworthy ship? Such is the primary issue here presented, the other, the validity of a seaman's release.

Plaintiff Thompson, a colored cook, long at sea, signed on the S. S. Rosina Marron, a tanker owned and operated by defendant. The vessel carried a complement of some forty men, including among them one Medina, a Cuban, as crew messman. Medina was definitely effeminate, a "queer", called Rosina or other feminine names by all aboard the ship, who at times was seen kissing other members of the crew. This was clearly not to the liking of Thompson, a big, clean-cut masculine individual, who neither smoked nor drank. But nothing outwardly had occurred between the two on their voyage from Marcus Hook, Pennsylvania, to Corpus Christi, Texas, in January 1950, save some words when Medina repeatedly gave Thompson the crew's "short orders" in Spanish, which Thompson could not understand, as he had repeatedly advised Medina.

The testimony further indicates that one Pittaway, to whose room Medina constantly resorted after evening chow, had been given a wrist watch by Medina and was apparently a favorite of his. Thompson, who was fond of cards, was accustomed also to go to Pittaway's room, shared with one Schopf, to get Pittaway and Medina, and perhaps others, to play cards with him, later in the evening. The night of January 12, 1950 Thompson went to Medina's room or "fo'c'sle", found the door not open as usual, but closed, and on entry says he found Medina and Pittaway, and Schopf, as well, engaged in a homosexual act. Neither Medina nor Pittaway testified. Schopf denied such acts himself, and also on the part of the other two. But Schopf does admit that when Thompson entered, he said to Thompson that "it was a good thing you came". So the innate tendencies of Medina were obviously finding an outlet at that time, at least with Pittaway.

In any event, it is clear that Thompson promptly stated what he had seen, both to his superior, the Chief Steward, Schiffers, and to their Union delegate, Kaplus. So the Union delegate called a meeting of all concerned, to decide whether to report the matter to the Coast Guard, or to have it settled then and there at the Union meeting, as to whether Medina should be compelled to leave the ship.

But this Medina refused to do, going into no details, but simply making a flat denial of the charge, and leaving the meeting. However, he did not leave till after one of those present had called Thompson's attention to the fact that he, Thompson, was the only one to support and make the charge to the Coast Guard against Medina and the others.

A few minutes later the meeting broke up, the rest leaving more or less together. Suddenly, as Thompson, in the darkness, turned a corner on the boat deck, he

was struck on the head from behind three times, by what afterwards turned out to be his own heavy meat cleaver, and Medina's high-pitched voice cried "I'm going to kill you". Were it not for the fact that Thompson's skull was much thicker than ordinary, as the doctors testified, this intent of Medina would undoubtedly have succeeded. As it was, Thompson's thick skull was cut through both tables. He was promptly given first aid, taken to his stateroom in critical condition, with unconsciousness for an uncertain period, lifted ashore at Corpus Christi and taken to the hospital there, on landing the next day. A short time after the vessel docked, the Coast Guard saw him but briefly in his then critical condition, and made a report on the situation, but apparently interviewed the other witnesses but casually, though objections to the introduction of the report in evidence were withdrawn toward the close of the trial. However, both for the above reason and because the truth as to Medina's homosexuality with Pittaway is relatively unimportant, as shown later, this report is of little moment. Medina was ultimately tried and convicted on the murderous assault charge, the homosexual angle of the matter apparently not being moved under the circumstances. Meanwile, Thompson was moved from the Corpus Christi Hospital to the New Orleans Hospital, as well as to others, and later to that at Stapleton, Staten Island, at the latter of which he received both in-patient and out-patient treatment, the latter still continuing to the present day.

■ Thompson still claims to be suffering from severe pains in the right side of his head, the site of the injury, down through the side of his face and ear, with hot and cold spells there, severe headaches, and a peculiar restless and dissatisfied urge, which drives him continually, to get away from himself, and from whatever he is doing to something else. In April 1950, when he was first discharged from the U. S. Marine Hospital at Stapleton, the diagnosis was "encephalopathy due to trauma", i. e., brain damage due to a blow, and the medical testimony indicates the above symptoms are all typical of that condition. True, he had had certain diseases, such as lues, duodenal ulcer, etc., all of which might have had a bearing on his neuropsychiatric condition, but the testimony clearly indicates the major cause of his neuropsychiatric condition to have been the fractures of his skull by the meat cleaver in the hands of Medina.

Meanwhile, shortly after his first discharge from Stapleton, April 28, 1950, he went to one Barron, of the Ship Owners Claim Bureau, representing defendant, to get settlement moneys on his case, having refused the importunities of a series of lawyers who sought to represent him. Meanwhile, Barron, or another agent of the defendant, had had Thompson examined by their Dr. Farr, who reported that Thompson then, in May 1950, would be able to return to work in three months, and had but a 10% permanent disability. This was in fact somewhat similar to the prognosis then made by the hospital itself, which was for a "good" recovery, and that he would be fit for duty May 29th. But that both Dr. Farr and the hospital were incorrect in their prognosis as to the length and amount of Thompson's mental and neuropsychiatric disability appears quite clear. For instance, not three months, but a year, later, we find him again confined in the Stapleton Hospital, where, among the treatment of other disconnected conditions, we find he had a "neuropsychiatric consultation", and a year after that, at the New Orleans Hospital, he was diagnosed, among other conditions, as having a "schizophrenic reaction". Finally, now, three and one-half years after Dr. Farr's examination, Thompson is still receiving out-patient treatment at the Stapleton Marine Hospital, where they recently gave him a head X-ray, obviously in order to ascertain any objective basis for his neuropsychiatric complaints. While the X-ray was negative, Dr. Farr himself admits these complaints are real, not sham. Furthermore, the undisputed testimony shows that Thomp-

son can not serve in his old position as cook, since the heat of the stove so seriously affects the pains in his head, and that he now is acting as a utility or mess man. Not only is this a job of lower rating than cook, but it of course carries substantially lower pay.

■ In any event, at Thompson's settlement conferences with Barron, the latter, or defendant's other agent, told Thompson of this prognosis of Dr. Farr, now found to be incorrect, and Barron refused to consider any greater settlement figure than $4,000 because he insisted to Thompson that Thompson was practically well then. Barron admits that if he had then known that Dr. Farr's prognosis was incorrect and that Thompson's future would be as serious as it has now turned out to be, he would not have evaluated his case at $4,000, but would have told Thompson to get a lawyer before he settled. Barron also told Thompson he thought he had a weak case on liability. For at that time the case of Keen v. Overseas Tankship Corp., 2 Cir., 1952, 194 F.2d 515, certiorari denied 343 U.S. 966, 72 S.Ct. 1061, 96 L.Ed. 1363, had not been decided, and Barron thought that notice to defendant of Medina's alleged vicious character, a difficult thing to prove, was essential, in order to impose liability on the owner of the ship. But it is clear that this is not the law, and that a seaman can recover if hurt by unseaworthy personnel, in the same way that he can if he is hurt by unseaworthy matériel, and quite regardless of the ship owner's notice or negligence.

Thus, as a result of these incorrect, though not intentionally false, statements of both fact and law to Thompson, this man, unrepresented by counsel, and without any independent medical advices of his own, signed a full release of his rights for the sum of $4,000. Such are the facts in outline.

These facts were presented to this Court sitting without a jury, on waiver by both sides, upon a complaint (a) for negligence, under the Jones Act, (b) for unseaworthiness, (c) for maintenance and cure, though the last-named cause of action is not pressed, under the circumstances. To this complaint defendant entered appropriate denials. We turn to the legal issues.

■ The recovery under the Jones Act, and derivatively under the Federal Employers' Liability Act [1] depends upon the negligence of the employer, and this, in turn, depends upon plaintiff's proving that defendant did not use reasonable care to provide plaintiff with a reasonably safe place to work, which caused his injury, in that he was subjected to working with a crew member—Medina —of a vicious disposition and not of a disposition equal to that of the ordinary member of a crew. Keen case, supra. To support such a cause of action, plaintiff must also show that defendant knew that Medina was either actually homosexual and dangerous, as distinguished from being merely effeminate, or, on the other hand, was otherwise vicious, in being willing to premeditatedly murder on provocation, as above. But since these elements of defendant's negligence and knowledge are not essential to recovery for unseaworthiness, and the quantum of damages in either aspect is much the same, we turn to the consideration of the case in the latter aspect.

### Unseaworthiness

■■ The Keen case [194 F.2d 518], decided since the occurrences herein, in fact since the execution of the release herein, correctly holds that a vessel can be rendered unseaworthy either by defective matériel or personnel, provided the latter be shown to be not the "equal in disposition and seamanship to the ordinary men in the calling." Thus an owner would be liable "if he signs on a homicidal paranoiac, whose appearance does not betray his disposition." This case further makes clear the fact that, just as a latent defect in materiel, un-

1. Jones Act, 41 Stat. 1007, 46 U.S.C.A. § 688. Federal Employers' Liability Act of April 22, 1908, 45 U.S.C.A. §§ 51–59.

known to the shipowner, suffices to render a vessel unseaworthy, so personnel, defective under the above standard, renders a vessel unseaworthy, and the owner liable, even if such defect is latent and unknown to the owner. The question then is, whether, in fact, Medina was, while perhaps not "competent to meet all contingencies (nevertheless) equal in disposition and seamanship to the ordinary men in the calling".

■ Clearly Medina was outstandingly effeminate, and it may well be, as plaintiff claims, that such an outstandingly effeminate individual is actually a homosexual, though such homosexual acts be unknown. It may further be that such a homosexual, in fact, is inherently vicious, with murderous tendencies. But no proof has been offered to support such a claim, and this Court certainly cannot take judicial notice of any psychologic, or psychiatric, claim which is so esoteric.

On the other hand, it is clear that this outstandingly effeminate individual, when charged with having committed this homosexual act, did, when he found that but one man could support this charge, promptly and cunningly plan to murder that man. For hardly had he ascertained the fact that the lips of but one man could make that charge, when he left the meeting, specifically called to consider his case, secretly got the key to the galley where Thompson's meat cleaver was kept, hid it in his shirt, concealed himself in a dark doorway by which he knew Thompson would shortly pass, and then, with the cry "I'm going to kill you", struck the owner of those lips in the head, not once, but thrice, with this heavy meat cleaver.

No more vicious crime can well be imagined. Nor was it one executed on the spur of the moment, but by plan and premeditation. To say that a man who was willing to do this was but of the character of the usual seaman is indeed a slander upon all who go to sea. Of course, they are a rough and ready lot, handy with their fists, and had Medina attacked Thompson with his fists, because of Thompson's charge, Medina might well be considered a fit companion for the others on the ship. But fisticuffs differ as widely as the sea itself from a planned murder with a meat cleaver.

■ Much testimony was taken, and much argument ensued, on the question of fact as to whether the above homosexual act of Medina did, or did not, occur. To this Court, this question seems largely immaterial. For it only goes to the particular species of provocation which induced Medina to plan and carry out the attempted murder of Thompson. If the homosexual act had been committed, then Thompson was making a true charge as to Medina. If, on the other hand, it had not been committed, then Thompson was making an untrue charge against Medina. But whether Medina was the more provoked by the making of a true charge or an untrue charge is immaterial. In any event, none but a man of truly vicious propensities would have attempted to murder the one making such a charge, whether true or untrue.

Looking at the matter from another angle, Medina, in the area of sex, suffered from an emotional aberration or delusion. Unless something seriously cut across or invaded that area, he was not violent, though effeminate. There had been no serious invasion of that area aboard the ship in the past—his being called Rosina in a joking way not being considered serious by either him or the others. Thus his homicidal tendency had not appeared. But the charge against him of homosexual acts, whether true or false, did invade, and seriously, this very area of his delusion or aberration. This serious invasion of his delusional area made him the equivalent of a "homicidal paranoiac", which the Keen case finds to be inherently dangerous to the ship. The ship was thus rendered unseaworthy, in that Medina was not "equal in disposition * * * to the ordinary men in the calling".

Thus, since, under the Keen case, Medina's character made the ship unseaworthy, to Thompson's damage, Thompson is entitled to recover, unless such

recovery is barred by his execution of the release, alluded to above.

## The Release

 We must here bear in mind that seamen are more carefully protected by the courts in their rights than are the ordinary run of mankind. As far back as 1823 it has been the law in this country that

"Every court should watch with jealousy an encroachment upon the rights of seamen, because they are unprotected and need counsel; because they are thoughtless and require indulgence; because they are credulous and complying; and are easily overreached. But courts of maritime law have been in the constant habit of extending towards them a peculiar, protecting favor and guardianship. They are emphatically the wards of the admiralty; and though not technically incapable of entering into a valid contract, they are treated in the same manner, as courts of equity are accustomed to treat young heirs, dealing with their expectancies, wards with their guardians, and cestuis que trust with their trustees. They are considered as placed under the dominion and influence of men, who have naturally acquired a mastery over them; and as they have little of the foresight and caution belonging to persons trained in other pursuits of life, the most rigid scrutiny is instituted into the terms of every contract, in which they engage. If there is any undue inequality in the terms, any disproportion in the bargain, any sacrifice of rights on one side which are not compensated by extraordinary benefits on the other, the judicial interpretation of the transaction, is that the bargain is unjust and unreasonable, that advantage has been taken of the situation of the weaker party, and that pro tanto the bargain ought to be set aside as inequitable." Harden v. Gordon, Fed.Cas. page 485, No. 6,-047.

In short, the burden is on the ship owner to show that the release was " 'fairly made with and fully comprehended by the seaman.' " Garrett v. Moore-McCormack Co., 1942, 317 U.S. 239, 63 S.Ct. 246, 252, 87 L.Ed. 239. How can it be claimed that, as to a seaman, a settlement is fairly arrived at, when the ship owner, though innocently, misrepresents both the facts and the law to the seaman, and, by claiming he is practically well, impliedly urges the seaman to settle for an inadequate sum, all this at a time when that seaman lacks his own advisors on either the facts or the law? In short, it would appear that, as to this matter of Thompson's neuropsychiatric syndrome, or anxiety complex, admittedly real, but a difficult thing at best to either diagnose or prognose, both Dr. Farr and the Stapleton Hospital were much mistaken as to its future effects and continued existence. Had defendant not advised Thompson of Dr. Farr's report or insisted that it was right, and that he was practically a well man, that would have been one thing. For then Thompson would presumably have acted upon the basis of his own judgment alone, not as influenced by the mistaken viewpoint and technical information of defendant. Or, had Thompson himself been properly represented legally, with his own medical advices on which to rely, then, even though defendant urged the correctness of its views, Thompson would have presumably settled upon the basis of his own considered and properly advised judgment. Under either of the above circumstances, the release would doubtless bind, as being "fairly arrived at". Bonici v. Standard Oil Co., 2 Cir., 1939, 103 F.2d 437; Sitchon v. American Export Lines, 2 Cir., 1940, 113 F.2d 830. But here, to the contrary, not only did Thompson not have the aid of any legal and medical advices of his own, but the defendant, which did have that aid, insisted that its advices were correct, and in essence urged Thompson to settle for

an amount now shown to be clearly inadequate, when it turns out that defendant's representations to Thompson as to his condition were, in fact, incorrect. Thus this seaman, in the same inferior position as a ward in dealing with his guardian, was induced to settle for an inadequate sum by the incorrect representations of the other party, in a superior position to him. Such a settlement certainly is not "fairly arrived at". Nor are McGraw v. States S. S. Co., D.C. N.D.Cal.S.D.1953, 116 F.Supp. 446 and Wilson v. McCormick S. S. Co., 38 Cal. App.2d 726, 102 P.2d 412, 1940 A.M.C. 1004 (State of California) to the contrary. For in McGraw [116 F.Supp. 447], the Court's opinion states that the ship owner "was in no better position to determine the clinical or medical facts than was libelant". And in Wilson [38 Cal.App.2d 726, 102 P.2d 417], the opinion says "The record is totally bereft of any evidence that the appellant steamship company or its representatives did anything either to urge respondent (seaman) to enter into negotiations for a settlement or to induce him to sign the release * * *." In the case at bar, on the contrary, the ship owner was in a better position to determine the medical facts due to the report of its own medical expert, Dr. Farr. And it is clear that defendant's agent, in insisting that Thompson was practically well, did induce Thompson to sign the release for the inadequate sum. The release accordingly is no bar, though, of course, the $4,000 paid thereon must be credited upon any award of damages made by this Court.

Turning to the question of damages, we find that Thompson, as a result of the fact that defendant's ship was unseaworthy, suffered actual, and permanent, brain damage. As a result (1) Thompson is no longer able to act regularly as a cook, with a petty officer's rating, a real loss in prestige and accommodations at sea, (2) he suffers a substantial pay loss, (3) he suffers, and will suffer, severe headaches and other unusual pains in his head off and on for the rest of his life, and (4) he has a neuropsychiatric condition or anxiety complex which renders him restless and dissatisfied with himself, no matter where he is or what he does.

■ It is true that one with an anxiety neurosis is apt to over-state, if not over-feel, the effects of this brain damage. Of course, his over-statements must be discounted, but not so his over-feeling. This latter defendant's own doctor testified was not sham, but real. It is, of course, also true, as the hospital records show, and Thompson admitted, that he had suffered from certain other diseases, which doubtless had a substantial effect upon this anxiety syndrome, in that they directly bore on certain of his hospitalizations and operations, if not on the brain damage itself. So we must consider the above symptoms of Thompson only to the extent that Medina's attack on him aggravated these symptoms.

■ However, bearing all these elements in mind, and the fact that Thompson is some sixty-three years old, and giving credit to defendant for the $4,000 already paid in connection with the release, the Court would feel that the additional amount of $16,000 would fairly compensate Thompson for his out-of-pocket loss, his pain and suffering and permanent disability caused him by the above unseaworthy condition of defendant's vessel.

The facts herein stated and the conclusions of law herein expressed shall be considered the findings of fact and the conclusions of law required by Fed.Rules Civ.Proc. rule 52, 28 U.S.C.A.

Judgment may be entered accordingly.