Elma SMITH, Individually and as Administratrix of the Estate of George E. Smith, Deceased, Plaintiff,

v.

AMERICAN MAIL LINE LTD., a corporation, Defendant.

No. 293–71C2.

United States District Court, W. D. Washington, Seattle Division.

July 10, 1973.

Levinson, Friedman, Vhugen, Duggan & Bland, Harold F. Vhugen, Seattle, Wash., for plaintiff.

Bogle, Gates, Dobrin, Wakefield & Long, Robert V. Holland, Seattle, Wash., for defendant.

### OPINION

BEEKS, Senior Judge.

On the evening of July 31, 1971 the SS AMERICAN MAIL was at sea, returning to the United States from the Orient. George Smith, a messman on the crew of the vessel, had been in the crew's lounge with several other seamen who were playing cards. He left the lounge, bunked down in his quarters on a starboard alleyway, and fell asleep while listening to stereo music from his tape recorder with a headset. During the evening watch someone quietly took a fire ax from its case some distance aft of Smith's room on the same alleyway. He proceeded to Smith's quarters, entered, and killed him instantly with a single blow from the ax which virtually severed his neck.

Smith's body was discovered at 0555, August 1, 1971, during the regular call to work. The fire ax lay on the bunk next to him. There was no sign of a struggle. The headset was askew but still worn by Smith, and the tape recorder had automatically shut off when the tape terminated. Rigor mortis had set in. The master, chief officer, purser and chief steward inspected the room carefully without disturbing its contents, took pictures, and locked and

sealed the room. A search of the ship and interview of the crew produced no clues.

The vessel was diverted to Adak, Alaska, where the Federal Bureau of Investigation interviewed the master, the other crew members and the twelve passengers. The murderer was never identified, and no charges have been filed in connection with the crime.

Smith's widow brought this lawsuit against his employer, the owner and operator of the SS AMERICAN MAIL. She claims damages under the Jones Act, the Death on the High Seas Act, and general maritime law. Her theory is that the vessel had on board a member of the crew who had vicious and homicidal propensities, and that this crew member struck Smith as he lay asleep in his bunk.

The case was tried to the court on oral testimony and depositions. Plaintiff sought to establish three facts: (1) that Smith was killed by a brutal and unprovoked attack; (2) that the passengers were mainly elderly retired persons or women, and that none had the motive or capability to commit the crime; and (3) that one or more of the crew had a motive and capability to murder Smith. Defendant maintains that plaintiff has failed to meet her burden of proof because she has failed to identify the murderer.

There is no evidence whatsoever to support the claim of negligence. Plaintiff's claim must stand, if at all, on proof by a preponderance of the evidence that unseaworthiness of the vessel proximately caused Smith's death.[1]

■ The owner of a vessel warrants to its crew that each seaman shall be equal in disposition and seamanship to ordinary men in the calling.[2] It is no

1. In Re Marine Sulphur Queen, 460 F.2d 89 (2d Cir. 1972) cert. den. sub. nom. Marine Sulphur Transport Corp. v. Heard, 409 U.S. 982, 93 S.Ct. 326, 34 L.Ed.2d 246 (1972), on remand 312 F.Supp. 1081; Lieberman v. Matson Navigation Company, 300 F.2d 661 (9th Cir. 1962); and Reynolds v. Royal Mail Lines, 254 F.2d 55 (9th Cir. 1958) cert. den. 358 U.S. 818, 79 S.Ct. 28, 3 L.Ed.2d 59.

2. Keen v. Overseas Tankship Corp., 194 F.2d 515 (2d Cir. 1952), cert. den. 343 U.S. 966, 72 S.Ct. 1061, 96 L.Ed. 1363 (1952).

defense that a shipowner had no knowledge of the vicious character of a crewman.[3] An analogy has often been drawn between a latent defect in the ship's equipment and a hidden propensity to violence in a crew member.[4]

A seaman with a proclivity for assaulting people may indeed, be a more deadly risk than a rope with a weak strand or a hull with a latent defect. . . . The problem, as with many aspects of the law, is one of degree. Was the assault within the usual and customary standards of the calling? Or is it a case of a seaman with a wicked disposition, a propensity to evil conduct, a savage and vicious nature? If it is the former, it is one of the risks of the sea that every crew takes. If the seaman has a savage and vicious nature, then the ship becomes a perilous place.[5]

Smith's primary duty as messman was to act as waiter for passengers and the ship's officers. He was 27 years old at time of death, had an honorable discharge from the United States Army, and claimed to have had some experience in the boxing ring. He had been married two and a half years. Although quiet and somewhat aloof in the performance of his duties on board, Smith was generally liked by passengers and fellow crew members alike. In port he was a flashy dresser, and enjoyed touring the night spots, where he was well known by the ladies there employed. He had no criminal record. He professed to be a member of the Black Panthers and an avid reader of Mao Tse Tung. Among the crew his closest acquaintance appears to have been a white messman by the name of Patrick Pappen, a confirmed alcoholic who often appeared shaky and nervous to the passengers and crew, and who did not hesitate to plead on occasion for a drink. Pappen is now deceased. Among the unescorted female passengers, Smith was on friendly terms with at least one. He also befriended a small but athletic white man by the name of Stuart Delaney, whose friendship with the same lady was terminated for reasons unknown to the Court. Smith and Delaney were close enough to exchange confidences. Among other things, Smith told Delaney that he smoked marihuana. Delaney arranged to meet Smith at a hotel in Keelung, Taiwan. Smith arrived with a female companion whose name appears from the record to have been "Super Star." Delaney visited Smith in his room on a number of occasions. This fraternization between a messman and a passenger was unusual, and struck crewmen and passengers alike as rather odd.

The only known friction between Smith and anyone else on the vessel was with a black saloon pantryman, Willie Sims. Sims was over six feet tall and weighed more than 200 pounds. He had a record of criminal convictions for crimes which include second and third degree assault; the last such conviction was in 1948. Sims was prone to exaggerate, and Smith was prone to call a bluff. They bickered frequently, and on occasion swore vigorously at each other. During one very heated argument, Smith drew an open pocket knife, whereupon Sims took a french knife from the pantry. This event was the closest to violence between Sims and Smith that any witness has admitted observing.

### 1. *Was the Assailant Vicious?*

■ Defendant maintains that, since the identity of the murderer is un-

3. *Ibid.*

4. *Ibid.* See also Thompson v. Coastal Oil Co., 119 F.Supp. 838 (D.N.J.1954), rev'd on other grds. 221 F.2d 559 (3d Cir. 1955), aff'd. 350 U.S. 956, 76 S.Ct. 345, 100 L.Ed. 832, reh. and reversal [reinstating judgment of the trial court] 352 U.S. 862, 77 S.Ct. 90, 1 L.Ed.2d 73 (1956) ; Kirsch v. United States, 450 F.

2d 326 (9th Cir. 1971) ; Stechcon v. United States, 439 F.2d 792 (9th Cir. 1971) ; and Walters v. Moore-McCormack Lines, Inc., 309 F.2d 191 (2d Cir. 1962), reh. en banc den. 312 F.2d 893.

5. Boudoin v. Lykes Brothers Steamship Co., Inc., 348 U.S. 336 at 339–340, 75 S. Ct. 382 at 385, 99 L.Ed. 354 (1954), 1955 A.M.C. 488 (Vol. I).

known, the court may not conclude that he had a violent temperament. The key in assault cases is that the disposition of the assailant must be unequal to that of ordinary men in the same calling.[6]

The nature of the fight itself does not establish a violation of the warranty of unseaworthiness. Therefore, a violation exists only if it can be shown that [the assailant] was an especially bellicose or pugnacious person.[7]

■ Mere failure to introduce any evidence on the assailant's past, however, is not necessarily fatal to plaintiff's case. Unseaworthiness is a species of strict liability. If a seaman is injured by a winch which becomes faulty, he need not show that on a number of other occasions the same winch nearly injured other members of the crew. The defective nature of gear is often demonstrated only by the circumstances surrounding the injury itself; the same may be said of the assault cases.

■ Defendant is correct in pointing out that, in some circumstances, even a deadly assault does not establish unseaworthiness. For example, the Court of Appeals for the Fifth Circuit has held that a seaman who stabbed his captain did not render the vessel unseaworthy.[8]

The evidence supported a finding that the attack was provoked by a cruel and abusive officer who carried a gun, cursed the crew, made false accusations, withheld pay wrongfully, stranded several members of the crew in foreign ports, and had some seamen arrested in port without cause. Immediately after the assault in question, the captain pulled his gun and fired several times at the assailant, who survived only by jumping overboard and swimming ashore. And in Connolly v. Farrell Lines, Inc.,[9] plaintiff was hit over the head with a large "board" by a man who had earlier threatened to kill him. The assailant, who had never before been involved in a fight, struck plaintiff who was armed and advancing on him. Not all violent assaults, therefore, are committed by persons with a vicious nature.

True, there are a number of cases in which a judgment for plaintiff was precluded by a lack of evidence of a savage or vicious nature.[10] In none of these cases, however, was the assault patently brutal or deadly. It is also true that a number of cases holding for plaintiff rely heavily if not exclusively on evidence of the assailant's prior acts of violence.[11] But these are, by and large, cases in which the assault does not by itself suggest the assailant's disposition, or there is evidence that he merely was

6. Keen v. Overseas Tankship Corp., supra n. 2.

7. Gulledge v. United States, 337 F.Supp. 1108 at 1111 (E.D.Pa.1972), 1972 A.M. C. 1187, citing Walters v. Moore-McCormack Lines, Inc., supra n. 4.

8. Robinson v. S. S. Atlantic Starling, 369 F.2d 69 (5th Cir. 1966), cert. den. 386 U.S. 993, 87 S.Ct. 1309, 18 L.Ed.2d 339 (1967).

9. Connolly v. Farrell Lines, Inc., 268 F.2d 653 (1st Cir. 1959), cert. den. 361 U.S. 902, 4 L.Ed.2d 158, 80 S.Ct. 208 (1959).

10. See, e. g., Boorus v. West Coast Trans-Oceanic Steamship Line, 299 F.2d 893 (9th Cir. 1962); McConville v. Florida Towing Corporation, 321 F.2d 162 (5th Cir. 1963); Kirsch v. United States, 450 F.2d 326 (9th Cir. 1971); Robinson v. S. S. Atlantic Starling, supra n. 8; Stankie-

wicz v. United Fruit Steamship Corporation, 229 F.2d 580 (2d Cir. 1956); Walters v. Moore-McCormack Lines, Inc., supra n. 4; Jones v. Lykes Bros. Steamship Co., 204 F.2d 815 (2d Cir. 1953), cert. den. 346 U.S. 857, 74 S.Ct. 72, 98 L.Ed. 370 (1953), reh. den. 348 U.S. 960, 75 S.Ct. 447, 99 L.Ed. 749 (1953); Connolly v. Farrell Lines, Inc., supra n. 9; and Walker v. Sinclair Refining Co., 331 F. Supp. 408 (E.D.Pa.1971), appeal dism'd 405 F.2d 885 (3d Cir. 1969).

11. See, e. g., Horton v. Moore-McCormack Lines, Inc., 326 F.2d 104 (2d Cir. 1964); Handley v. United States, 157 F.Supp. 616 (S.D.N.Y.1958); and Bartholemew v. Universe Tankships, Inc., 168 F.Supp. 153 (S.D.N.Y.1957), aff'd 263 F.2d 437 (2d Cir. 1959), cert. den. 359 U.S. 1000, 79 S.Ct. 1138, 3 L.Ed.2d 1030 (1959).

provoked by plaintiff or that the injury was the accidental result of a scuffle.

The confusion in the case law on this matter is directly traceable to the language chosen by the Supreme Court in its decision of Boudoin v. Lykes Brothers Steamship Co.[12] A narrow reading of that case suggests that every assault must fall into only one of two distinct and mutually exclusive categories: Either the assault is "within the usual and customary standards of the calling," such as a fistfight or sailors' brawl, or it involves "a seaman with a wicked disposition, a propensity to evil conduct, a savage and vicious nature." [13] Yet surely there is occasionally a fight within the usual standards in which one of the combatants has a savage nature; and just as surely some of those assaults which exceed the customary standards of the calling must be committed by seamen who are not wicked or vicious.

In all of the caselaw there is a common denominator which is consistent with the spirit of *Boudoin*: the warranty of seaworthiness is breached unless the assailant was equal in disposition to ordinary men in the calling.[14] Proof of violent disposition may be established by

. . . either an assault with a dangerous weapon or independent evidence of the assailant's exceptionally quarrelsome nature, his habitual drunkenness, his severe personality disorder, or other similar factors.[15]

The gravamen of the cause of action in assault cases is viciousness of the actor, not viciousness of the act.[16]

Yet at some point in the scale of brutality the assault, in and of itself, may provide a sufficiently strong inference to show the viciousness of the assailant.[17] At that point, the burden of persuasion shifts to defendant. The more vicious the attack, the greater the inference of viciousness in the character of the assailant, and the greater defendant's burden becomes to show good character, or provocation or misconduct by the person assaulted. The facts here present a classic case of proof of character by the assault itself.

No more vicious crime can well be imagined. Nor was it one executed on the spur of the moment, but by plan and premeditation. To say that a man who was willing to do this was but of the character of the usual seaman is indeed a slander upon all who go to sea. . . . [F]isticuffs differ as widely as the sea itself from a planned murder. . . .[18]

### 2. *Was the Assailant a Crew Member?*

Plaintiff argues that liability is established merely by the presence of Sims; but plaintiff has failed to convince the court that Sims murdered Smith. The court specifically finds that plaintiff has failed to establish by a preponderance of the evidence that Sims or any other crew member killed Smith. Perhaps it indeed was Sims, or Pappen, or even a member of the crew who has never been a prime suspect. The court holds merely that plaintiff has not met her burden on this point.

---

12. Boudoin v. Lykes Brothers Steamship Co., Inc., 348 U.S. 336, 75 S.Ct. 382, 99 L.Ed. 354 (1954), 1955 A.M.C. 488 (Vol. I).

13. See, e. g., Stechcon v. United States, 439 F.2d 792 (9th Cir. 1971).

14. See, e. g., Keen v. Overseas Tankship Corp., supra n. 2; Walters v. Moore-McCormack Lines, Inc., supra n. 4; Clevenger v. Star Fish & Oyster Company, 325 F.2d 397 at 402 (5th Cir. 1963); Smith v. Lauritzen, 356 F.2d 171 (3d Cir. 1966); and Hildebrand v. S. S. Commander, 247 F.Supp. 625 at 627–628 (E. D.Va.1965).

15. Walters v. Moore-McCormack Lines, Inc., supra n. 4, 309 F.2d at 193.

16. Gulledge v. United States, 337 F.Supp. 1108 (E.D.Pa.1972), 1972 A.M.C. 1187; and Walters v. Moore-McCormack Lines, Inc., supra n. 4. Cf. Kirsch v. United States, 450 F.2d 326 (9th Cir. 1971).

17. Walters v. Moore-McCormack Lines, Inc., supra n. 4; and Clevenger v. Star Fish & Oyster Company, 325 F.2d 397 (5th Cir. 1963).

18. Thompson v. Coastal Oil Co., supra n. 4, 119 F.Supp. at 843.

Plaintiff has argued alternatively that since no passenger was shown to have a motive, and since Smith's closest contacts were with crewmen, the murderer must have been a member of the crew. Yet the nature of Smith's job brought him into contact with passengers several times a day. While these associations appear to have been casual, they were on the whole more substantial than Smith's contacts with the great majority of the crew. At least one passenger had on a number of occasions visited Smith in his room. Plaintiff has not persuaded the court that the assailant was a crew member.

3. *If the Murderer was a Crew Member, Was Unseaworthiness the Cause of the Assault?*

Even if plaintiff had proved that Smith was killed by a crew member, the court would rule for defendant. On the issue of causation plaintiff refers to two types of cases: (1) those involving the disappearance of a vessel, and (2) cases in which the circumstances justify a modest amount of speculation by the trier of fact.

Courts will sometimes apply liberalized rules of proof of causation when a vessel is lost at sea. Thus, where a tug was manned only by the master and a seventeen year old high school student with no seagoing experience, an accident was held properly inferred from the mere fact of disappearance, and the trier of fact was allowed to further infer that the accident was caused by utilization of an incompetent crew.[19] Similarly, a trial court was allowed to infer that a ship overloaded with molten sulphur was unseaworthy when it suddenly

disappeared with not even a distress signal, and that the unseaworthiness caused the deaths of the crew.[20]

In the second category there are a few cases in which the finder of fact is specifically authorized to engage in a degree of speculation. In Lavender v. Kurn,[21] a railroad employee was killed on the job by a blow to the head. There were no witnesses, and the evidence conflicted as to whether the blow came from some object protruding from a train, from one of the numerous hobos camping near the switchyard, or from some other cause. Judgment for plaintiff was reversed in the state appellate court, but on certiorari the United States Supreme Court reinstated the judgment of the trial court, stating:

> Whenever facts are in dispute or the evidence is such that fair-minded men may draw different inferences, a measure of speculation and conjecture is required on the part of those whose duty it is to settle the dispute by choosing what seems to them to be the most reasonable inference.[22]

Thus, plaintiff urges the court to solve the puzzle of Smith's death by indulging in a modest amount of speculation. The court has obliged, but has not drawn the inferences suggested by plaintiff.

It is most important to note that the murderer did not come raging into Smith's cabin and strike him with whatever was close at hand. He chose his time and place carefully. He was seen or heard by no one. He selected his weapon with forethought, and left no fingerprints. He struck savagely and efficiently, and after he committed his crime he left as stealthily as he had en-

19. Admiral Towing Company v. Woolen, 290 F.2d 641 (9th Cir. 1961).

20. In re Marine Sulphur Queen, supra n. 1.

21. Lavender v. Kurn, 327 U.S. 645, 66 S. Ct. 740, 90 L.Ed. 916 (1945).

22. *Ibid.* at 653, 66 S.Ct. at 744, 90 L.Ed. at 923. See also McDonough v. Buckeye S. S. Co., 103 F.Supp. 473 (N.D.Ohio 1951), aff'd 200 F.2d 558 (6th Cir.

1952), cert. den. 345 U.S. 926, 73 S.Ct. 785, 97 L.Ed. 1357; and Olson Towboat v. Dutra, 300 F.2d 883 (9th Cir. 1962). Compare Barrios v. Waterman Steamship Corporation, 290 F.2d 310 (5th Cir. 1961); Kiesel v. American Trading and Production Corporation, 347 F.Supp. 673 (D.Maryland 1972); and Tsangarakis v. Panama Steamship Co., 397 F.2d 806 (3d Cir. 1968).

tered. When he was interviewed (as he must have been) by investigators, he betrayed no sign of guilt—no shame or remorse, no sorrow, not even fear of discovery. The injury here was not the result of a mere grudge or altercation. The motive for such a crime must have run in the deepest of human emotions. The reason for such emotion is unknown to the court, but the circumstances strongly indicate that the motive was related to some secret, highly personal affair unrelated to the business of the ship. There can be no recovery in such a case.[23]

Plaintiff cites a very unusual case to illustrate the rule that a brutal assault can by itself establish that the assailant had a violent character. This court believes that it can also be used to illustrate the rule on wrongful conduct. In Thompson v. Coastal Oil Co.,[24] plaintiff Thompson accidentally witnessed a homosexual act of a fellow crew member by the name of Medina. After Thompson had told other crewmen about the incident, but before it was reported to the Coast Guard, Medina determined to kill Thompson. He waited on a dark part of the deck for Thompson to pass alone, and then leaped out and struck him from behind on the head three times with a meat cleaver. The evidence clearly negated any reference of wrongdoing on Thompson's part. There was evidence corroborating the allegation of Medina's homosexuality. His motives were apparently revenge for exposure, and fear of subsequent testimony before the Coast Guard. Surely the court would not have allowed Thompson to recover had his injury been caused by his own wrongdoing—for example, if he had been blackmailing Medina.

Assault cases are distinguishable from gear cases in at least this respect: A seaman cannot incite a winch to strike him; a winch never injures a man because of greed, revenge, hate, or fear. A defective winch is a danger to anyone who uses it, even though the defect may not be discovered until the injury occurs. A man, on the other hand, may be eminently qualified in all respects as a crew member, and yet be provoked to assault by the wrongful conduct of his victim.

### 4. *Conclusion.*

Inferences are strong that Smith's murderer had a vicious nature; yet inferences are also strong that Smith was killed for some unspecified misdeed of his own. Moreover, the court has not been persuaded that the murderer was a crewman. In sum, the court has a substantial doubt as to defendant's liability.

Plaintiff's cause of action is dismissed. Counsel for defendant shall prepare and submit an order and judgment accordingly. This opinion shall serve as the court's findings of fact and conclusions of law pursuant to Civ.R. 52(a).

---

**23.** McConville v. Florida Towing Corporation, 321 F.2d 162 (5th Cir. 1963); Robinson v. S.S. Atlantic Starling, supra n. 8; Brock v. Standard Oil Co. of New Jersey, 33 F.Supp. 353 (E.D.Pa.1940); Watson v. Joshua Hendy Corporation, 245 F.2d 463 (2d Cir. 1957); Condon v. Grace Line, 97 F.Supp. 197 (N.D. Cal.1951); Kuhl v. Manhattan Tankers Co., Inc., 1972 A.M.C. 238 (E.D.Va. 1971); and Holmes v. Mississippi Shipping Company, Inc., 301 F.2d 474 (5th Cir. 1962), cert. dism'd. 371 U.S. 802, 83 S.Ct. 13, 9 L.Ed.2d 46. *Cf.* Donovan v. Esso Shipping Company, 259 F. 2d 65 (3d Cir. 1958), cert. den. 359 U.S. 907, 79 S.Ct. 583, 3 L.Ed.2d 572; and Jackson v. Pittsburgh S.S. Co., 131 F.2d 668 (6th Cir. 1942). See also Admiral Towing Company v. Woolen, 290 F.2d 641 at 653 (9th Cir. 1961) [dissent].

**24.** Thompson v. Coastal Oil Co., supra n. 4.