## BROCK v. STANDARD OIL CO. OF NEW JERSEY.

### No. 81.

District Court, E. D. Pennsylvania.
March 4, 1940.

Freedman & Goldstein, of Philadelphia, Pa., for plaintiff.

Krusen, Evans & Shaw, of Philadelphia, Pa., for defendant.

KALODNER, District Judge.

The libellant, a seaman, brought an action in personam in admiralty (1) for damages based on alleged negligence, and (2) for maintenance and cure.

The action for damages contained three counts:

(1) That the injury was caused by the negligence of the respondent in failing to protect the libellant against assault of a fellow-employee;

(2) That the respondent failed to provide proper medical and surgical care and attention; and

(3) That the respondent compelled the libellant to work despite his injuries.

The first count has been withdrawn by counsel for the libellant (p. 2, Libellant's Brief) and properly so, as is demonstrated by the record.

A brief statement of the facts is appropriate at this point:

The libellant on November 27, 1937 was employed as an able-bodied seaman on board the steamship W. L. Steed owned by the respondent. At about midnight, while the vessel was in Everett, Mass., discharging cargo, the libellant became involved in an argument with one Armistead, an ordinary seaman. Libellant had loaned his overcoat to Armistead. He charged Armistead with having taken or lost some of the libellant's papers which had been in the pockets of the overcoat. The dispute was entirely outside the scope of the employment of either man and unconnected

with their duties. It occurred in the seamen's quarters while both men were off duty. There were no officers present. The argument was climaxed by fisticuffs. The following from pages 9, 10, and 11 of the Notes of Testimony give a vivid picture of the incident:

Libellant:

"A. So he got mad—he said, 'Well, in case I lost your papers, what are you going to do about it?' He struck at me with his left hand—* * *"

By the Court:

"Q. You say he swung at you? A. Yes, sir, he struck at me with his right hand. I was facing him. I knocked his hand up with this hand here (indicating)."

By Mr. Goldstein:

"Q. With what hand? A. With my left —and I hit at him with my right. I hit at him with my left as he was going down, and it hit the top of his head and ricocheted and hit the top of the bunk."

By the Court:

"Q. Just how long did that take—that event you just described? A. I would say less than a minute, sir.

"Q. In other words, he swung at you? A. Yes, sir.

"Q. You deflected the blow and struck him twice? A. Yes, sir.

"Q. It was on the second blow you struck the bunk and broke your hand? A. Yes, sir.

"Q. That would take about two or three seconds, wouldn't it? A. Yes, sir, less than a minute, I should imagine."

By Mr. Goldstein:

"Q. What happened to Mr. Armistead? A. Mr. Armistead left the forecastle and went amidships.

"Q. Did he actually land any place on you? A. Sir?

"Q. Did he actually land any place on you? A. On my arm only.

"Q. He struck the first blow? A. Yes, sir.

"Q. Did he aim another blow at you? A. No, sir; he didn't have a chance.

"Q. That first blow struck your shoulder? A. Yes, sir.

"Q. That was the only blow he struck you? A. Yes, sir.

"Q. You say that Armistead left the room? A. Yes, sir—went amidships."

It was the injury to the hand, above referred to, which resulted in the action under consideration.

Libellant's own statement as to how he received his injury makes it clear beyond all question that he was responsible for his initial injury.

Two questions then remain for disposition:

(1) Did the respondent fail to provide proper medical and surgical care and attention; and

(2) Did the respondent compel libellant to work despite his injury, thereby aggravating the initial injury so as to make the respondent responsible?

As to the question, Did the respondent fail to provide proper medical and surgical care and attention:

Almost immediately after he suffered his injury, the libellant at 12:30 A. M. in the morning went to the captain's quarters and asked for a certificate of admission to the Marine Hospital, which the captain gave to him, after bandaging the libellant's hand. Libellant then engaged a taxicab and drove to the United States Marine Hospital in Chelsea, Mass. He returned to the ship about two hours later and reported to the captain that he had been refused treatment at the hospital. The captain then supplied the libellant with unguentine and epsom salts and gave him instructions as to further treatment of his hand. The libellant then turned in until 4 A. M., when he reported for duty and stood his morning watch until 8 A. M. The vessel set sail a few minutes later for New York. Before sailing the captain asked the libellant if he wished to go again to the Marine Hospital but the libellant declined, stating that he preferred to remain aboard and sail with the ship. During the voyage to New York the libellant performed his regular duties, including that of helmsman, of his own volition. In addition, he performed a considerable amount of overtime voluntarily, for which he received extra pay.

According to libellant, he received no treatment for the injury to his hand during the voyage. The captain, however, testified that he gave the libellant daily treatments; that the libellant was instructed to soak his hand in a hot solution of epsom salts, etc. The voyage to New York took a little more than three days. Soon after arrival the libellant went to the United States Marine Hospital at Stapleton, Staten

Island, where his injury was diagnosed as a fracture of the thumb of the left hand. The libellant was then paid off with the rest of the crew, the voyage having been completed. In compliance with his application, he was given employment on the ship as a watchman for several days, when he was discharged for intoxication and threatening a fellow-employee.

It is unnecessary further to discuss the extent and duration of the libellant's injuries, since I find as a fact that the injury to the libellant was the result of his own willful misconduct and with that finding counsel for the libellant is in agreement, as before mentioned.

■ I also find as a fact that the respondent was unaware of the extent of the libellant's injuries, and that the respondent gave adequate attention to the libellant during the course of the voyage to New York under the circumstances. It was not until after the completion of the voyage that it was learned that the libellant's thumb was fractured.

In the Mexoil, Leonard June, Appellant v. Pan-American Petroleum & Transport Company, Appellee, 5 Cir., 1928, 25 F.2d 457, 458, 1928 A.M.C. 829, the Court said: "With regard to the claim for maintenance and cure, it is reasonably certain that appellant did not request any further treatment than he received while on the vessel, and, of course, he received his maintenance and his wages for that period; when he left the ship at New Orleans, the captain offered him a marine hospital certificate which would have secured him the best of care and medical attention. *In tendering the certificate, the master complied with any obligation the vessel had as to cure, and there is no doubt that appellant declined it.*" (Italics supplied.)

See also The Birkenhead, D.C., 51 F.2d 116; also The Van der Duyn, 2 Cir., 261 F. 887, 890. In that case a seaman received an injury, while the ship was at sea, which was attended with considerable swelling. Later, when the ship arrived in port, an X-ray disclosed that the arm had been fractured. The court there held that while the ship's officers had made an error of diagnosis, that they had exercised the reasonable care which was required. "We do not think that error of judgment of the officers of the ship, or the surgeon who was employed, and the lapse of time before the respondent received competent medical aid, are sufficient upon which to base liability."

■ I also find as a fact that the respondent did not compel the libellant to work during the course of that voyage, and that such work as the libellant engaged in, including the overtime work for which he received extra compensation, was voluntary on his part, and further that his work did not aggravate his injury.

I therefore find for the respondent upon the issue of negligence.

■ There remains the action for maintenance and cure. Since the libellant's injury was due to his own willful misconduct, and since there was no negligence on the part of the respondent, there can be no recovery for maintenance and cure by the libellant. See The Osceola, 189 U.S. 158, 23 S.Ct. 483, 47 L.Ed. 760; The Bouker No. 2, 2 Cir., 241 F. 831, certiorari denied, 245 U.S. 647, 38 S.Ct. 9, 62 L.Ed. 529; The City of Alexandria, D.C., 17 F. 390; The Alector, D.C., 263 F. 1007.

■ It appeared from the testimony that during the day and preceding the midnight argument between the libellant and Armistead that the libellant had been ashore and had had several drinks. There would be no justification for a finding that the libellant was drunk at the time of his argument with his fellow-seaman. Even if he were drunk he could not recover.

■■ In Barlow v. Pan Atlantic S. S. Corporation et al., 2 Cir., 101 F.2d 697, 698, a seaman fell down a ladder leading to the well dock of the vessel because he was drunk. It was held that he could not recover maintenance and cure. "The general rule that a vessel and her owner are liable for maintenance and cure, if a seaman falls sick or is wounded in the service of the ship, is subject to a well-recognized exception, dating back to some of the earliest maritime codes, in case his disease or injury arises from his own vices or willful misconduct. * * * When it is clear that a seaman's injuries occurred solely because of his intoxication, we think they are rightly held to be occasioned by his own misconduct and that the shipowner is under no duty to provide maintenance and cure."

For the reasons above stated, judgment may be entered for the defendant in the action for negligence and for maintenance and cure.