Alfred S. STONE

v.

MARINE TRANSPORT LINES, INC.

No. 3873.

United States District Court
D. Maryland.

March 17, 1960.

John J. O'Connor, Jr., O'Connor & Preston, Baltimore, Md., for libellant.

Robert H. Williams, Jr., Niles, Barton, Yost & Dankmeyer, Baltimore, Md., for respondent.

R. DORSEY WATKINS, District Judge:

This is an action for maintenance and cure brought by libellant (Stone) against the respondent, libellant's employer, for the consequences of an alleged assault by a fellow seaman (Plyler) upon libellant Stone, an able-bodied seaman, on January 20, 1956, while in the service of a ship operated by respondent. Later Stone brought an action against his employer, for the same incident, under the Jones Act (46 U.S.C.A. § 688). The cases were heard together on December 1, 2, 3, 7, 8 and 9, 1959. The Jones Act case was submitted to the jury on issues as to whether the ship, on January 20, 1956 "was unseaworthy with respect to personnel, that is, Plyler" and whether the respondent, through the master and officers of its ship, was "negligent in the retention of Plyler as a member of the crew." The jury, in nearly if not quite minimum time, answered both issues in the negative, and verdict was accordingly (after the jury had been polled) entered for the respondent. Ruling on the maintenance and cure claim was postponed until after the court had heard and denied Stone's motion for a new trial in the Jones Act case; and had heard argument and received briefs on the maintenance and cure claim.

█ The decision of the jury on the claims of unseaworthiness and negligence is of course not dispositive of the case of maintenance and cure (Meirino v. Gulf Oil Corp., D.C.D.Pa.1959, 170 F. Supp. 515), since for such recovery, in the absence of wilful misbehavior or dis-obedience, or a deliberate act of indiscretion, it is sufficient that Stone prove that he received injuries while in the "service of the ship." See Braen v. Pfeifer Oil Transp. Co., Inc., 1959, 361 U.S. 129, 131–133, 80 S.Ct. 247, 250, 4 L.Ed.2d 191 (a suit under the Jones Act, but discussing the "service of the ship" formula).

█ A relatively brief summary of the salient facts will suffice to present the controlling legal issues.

On January 20, 1956, Stone had gone ashore on liberty at Acquadilla, Puerto Rico, at some time shortly after noon, as had Plyler, both of whom were quartered in the same "forecastle." They both returned to the ship somewhere about 6 p. m. What their respective conditions at that time, particularly with respect to sobriety (or perhaps, more realistically, with respect to insobriety) were, is the subject of perhaps as direct conflict as seamen's cases can evoke. According to Stone, he had had 10–12–15 beers and a couple of "shots" of whiskey, but he was perfectly sober. Plyler said he had had four to five beers, and he was perfectly sober. Stone says Plyler was drunk on his return to the ship. Plyler says Stone at the time shortly after return to the ship, when he was to be called for his watch, was sound asleep, drunk. These were the only two who testified in court. By depositions of master and crew, there was almost a similar standoff as to which, if either was drunk, and if so, which had more nearly obtained his apparent desideratum of nirvana.

The succeeding events are likewise told with nearly the same implausible contradictions. According to Stone in court, Plyler without provocation attacked Stone in the forecastle, gouged Stone's one good eye, pursued him into the recreation room and there gave him, while defenseless, a thorough "going over." Within a short time of January 20, 1956, Stone attributed the incident as originating in the recreation room. He was corroborated as to *both* initia-

tions by the depositions of crew members. Plyler testified that Stone was the aggressor in the forecastle; that he ran into the recreation room to avoid Stone; that Stone followed, and that Plyler struck only one blow, solely in self-defense.

There was consistency in the testimony that seamen generally—and on the ship in question—are and were given to drinking and fighting. One of Stone's witnesses testified that seamen drink constantly. Plyler testified that 90% of seamen fight. The captain on the preceding voyage testified that "there is hardly a trip that somebody doesn't get his head knocked off; very often there is a fight, and if I had to sit up and make a note every time there was a crew fight, I would never get to bed."

Based upon the court's observation of Stone and Plyler upon the stand; the depositions of the masters on the preceding and instant voyage; and the depositions of members of the crew, the court finds as a fact that the encounter on January 20, 1956 was a brawl between two seamen who by ordinary standards would each be called intoxicated or drunk but neither of whom was deprived of his senses, such as they may have been. Specifically, the court finds as a fact, and concludes as a matter of law, that the injuries Stone received on January 20,

1956 were not solely the result of intoxication or wilful disobedience.

Stone was a one-eyed, punch drunk ex-boxer-sailor, fifty-six years old, who had received serious head injuries in an automobile accident many years before January 20, 1956, several technical knockouts as a fighter,[1] and several head injuries in his services as a sailor, which had resulted in visual disturbances. Nevertheless, before January 20, 1956, he had had no difficulty in securing steady employment as a seaman.[2]

Were the court at liberty to do so, it would question the applicability, on January 20, 1956, of Mister Justice Story's description of the typical sailor, who because of his "friendless" and "unprotected" nature, requires "guardianship" as "wards of the admiralty", subject to "parental law" Harden v. Gordon, C.C. D.Me.1823, 11 Fed.Cas. pages 480, 483, 485, No. 6,047.[3]

The liberalization under the Supreme Court decisions, therefore controlling upon this court [4] is fairly stated in Gilmore and Black, The Law of Admiralty (1957), section 6–6:

"The 'poor and friendless' seaman is thus the beneficiary of a system of accident and health insurance at shipowner's expense more comprehensive than anything

---

1. Stone described himself as having been a "ham and egg" (now euphemistically called a "club") fighter, not a boxer, who had willingly taken many blows to land one.

2. To what extent this may have been due to intrinsic merit, and to what extent to the fact that he was a member of the National Maritime Union, with which the ship had a contract, pursuant to which the hiring hall is called to fill vacancies, and seamen are sent, who, if they have the proper card, two arms and two legs, are not intoxicated at the time, and are without outstanding charges, must be accepted—the court, under the law as it understands it, is not permitted to inquire.

3. Guardianship and parental guidance normally involve some sense of responsibility

for, and control over, the conduct of the ward or child; with obligation to punish, as well as protect and reward. Doting aunt, or fairy godmother, would seem more appropriate characterizations in fact of the status imposed upon admiralty courts vis a vis seamen. See Lovitt, "Things are Seldom what they Seem: The Jolly Little Wards of the Admiralty," 1960, Vol. 46, No. 2, Am.Bar Ass'n. Journal 171.

4. This court has great sympathy with Judge Wyzanski's obvious frustration detailed in New York, New Haven & Hartford R. Co. v. Henagan, 1 Cir., 1959, 272 F.2d 153, 155:
"* * * I hope I am a lawful judge, and I recognize the limits of my authority, whether appellate judges do or not."

yet achieved by shorebound workers * * * "5

The general nature of the seaman's rights and the liberal approach to be adopted, are clearly stated in Aguilar v. Standard Oil Co. of New Jersey, 1943, 318 U.S. 724, 63 S.Ct. 930, 87 L.Ed. 1107:

"* * * Whether by traditional standards he (shipowner) is or is not responsible for the injury or sickness, he is liable for the expense of curing it as an incident of the marine employer-employee relationship. So broad is the shipowner's obligation, that negligence or acts short of culpable misconduct on the seaman's part will not relieve him of the responsibility. *Peterson v. The Chandos*, 4 F. 645 (D.C.); see also *The J. F. Card*, 43 F. 92 (D.C.); *The Ben Flint*, 1 Abb. (U.S.) 126, 3 Fed.Cas. [p. 183] No. 1,299 (D.C.). Conceptions of contributory negligence, the fellow-servant doctrine, and assumption of risk have no place in the liability or defense against it. Only some wilful misbehavior or deliberate act of indiscretion suffices to deprive the seaman of his protection. *The Ben Flint, supra.* The traditional instances are venereal disease and injuries received as a result of intoxication, though on occasion the latter has been qualified in recognition of a classic predisposition of sailors ashore. Other recent cases, however, disclose a tendency to expand these traditional exceptions." 318 U.S. at pages 730–731, 63 S.Ct. at page 934.

\* \* \* \* \* \*

"* * * In this respect it is a broader liability than that imposed by modern workmen's compensation statutes. Appropriately it covers all injuries and ailments incurred without misconduct on the seaman's part amounting to ground for forfeiture, at least while he is on the ship, 'subject to the call of duty as a seaman, and earning wages as such.'" 318 U.S. at page 732, 63 S.Ct. at page 934.

\* \* \* \* \* \*

"* * * Certainly the nature and foundations of the liability require that it be not narrowly confined or whittled down by restrictive and artificial distinctions defeating its broad and beneficial purposes. If leeway is to be given in either direction, all the considerations which brought the liability into being dictate it should be in the sailor's behalf. * * * Such refinements (contended for by the respondent) cut the heart from a protection to which they are wholly foreign in aim and effect." 318 U.S. at pages 735, 736, 63 S.Ct. at page 936.

Accordingly, a libellant who in disobedience to his orders had overstayed his shore leave, and was injured "due to no negligence but his own" while returning to his ship, was allowed recovery in Farrell v. United States, 1949, 336 U.S. 511, at page 516, 69 S.Ct. 707, at page 709, 710, 93 L.Ed. 850, the court saying:

"It has been the merit of the seaman's right to maintenance and cure that it is so inclusive as to be relatively simple, and can be understood and administered without technical considerations. It has few exceptions or conditions to stir contentions, cause delays, and invite litigation. The seaman could forfeit the right only by conduct whose wrongful quality even simple men of the calling would recognize—insub-

---

5. Perhaps the longshoreman, except as to the sickness aspect of maintenance and cure, has improved even upon the seaman. See Gardner, Remedies for Personal Injuries to Seamen, Railroadmen, and Longshoremen, 1958, 71 Harv. L.Rev. 438; Tetreault, Seamen, Seaworthiness, and the Rights of Harbor Workers, 1954, 39 Cornell L.Q. 381; Ambler, Seamen are "Wards of the Admiralty" but Longshoremen are now more Privileged, 1954, 29 Wash.L.Rev. 243.

ordination, disobedience to orders, and gross misconduct. On the other hand, the master knew he must maintain and care for even the erring and careless seaman, much as a parent would a child * * *."

The extent to which service to the ship may be extended is exemplified in Warren v. United States, 1951, 340 U.S. 523, 71 S.Ct. 432, 95 L.Ed. 503. The libellant while on shore leave in Naples, had some wine to drink, and went to a "dance hall." While leaning over the edge of a balcony, the support he was holding gave way. For injuries from the fall he was held entitled to maintenance and cure, the majority saying (340 U.S. at page 528, 71 S.Ct. at page 435):

" * * * The standard prescribed is not negligence but wilful misbehavior. In the maritime law it has long been held that while fault of the seaman will forfeit the right to maintenance and cure, it must be 'some positively vicious conduct—such as gross negligence or willful disobedience of orders.'"

Gilmore and Black, op. cit., section 6–8, summarize the law as of 1957 as follows:

"The opinion in the three Supreme Court shore leave cases all recognize that the seaman forfeits his right to maintenance and cure by his own wilful misconduct. As Justice Rutledge put it in Aguilar, 'the traditional instances are venereal disease and injuries received as a result of intoxication, though on occasion the latter has been qualified in recognition of a classic predisposition of sailors ashore.' It may be that changing attitudes toward sexual activity and the analogy of the Army's handling of the problem (it is not misconduct to contract venereal disease; it is misconduct to fail to report infection) will lead to a relaxation of the venereal disease rule. A colorful 1948 case decided by a New York state court may be indicative [Koistinen v. American Export Lines, Inc., 194 Misc. 942, 83 N.Y.S.2d 297]: maintenance and cure was awarded to a seaman who had suffered a broken leg in jumping from a window of a Yugoslavian brothel following a dispute over financial arrangements. In line with Justice Rutledge's recognition of the 'classic predisposition of sailors ashore', even a finding that a seaman's injuries resulted from his drunkenness has been held not to bar his recovery. Misconduct on board ship as well as misconduct ashore will forfeit the right, but the courts have not been inclined to construe misconduct as including what the opinions refer to as 'horseplay.' It is apparent from the Farrell case (plaintiff fell over a guard chain into a lighted dry-dock) that negligence or contributory negligence of even the grossest kind will not of itself qualify as misconduct and forfeit the right.

"The Supreme Court opinions in the Taylor case [Calmar S.S. Corp. v. Taylor, 303 U.S. 525, 58 S.Ct. 651, 82 L.Ed. 993] and the shore leave cases seem to have left no further room for dispute about the circumstances under which maintenance and cure may be recovered. With the exception of borderline cases on misconduct, there is no reason to anticipate further litigation. The remedy has become absolute."

In Bentley v. Albatross Steamship Co., 3 Cir., 1953, 203 F.2d 270, 1953 A.M.C. 645, maintenance and cure were allowed when a sailor was burned aboard the vessel by leaning against an unguarded hot radiator in recreation quarters, while in a drunken stupor. This condition was classed as unseaworthiness, and the case may partially be distinguishable on this ground.

Fuentes v. Panama Canal Co., D.C. N.Y.1956, 146 F.Supp. 303, 1957 A.M.C. 413, held a seaman entitled to maintenance and cure for injuries sustained

when he became drunk, and exhibited signs of schizophrenia.[6]

In opposition, respondent cites denial of maintenance and cure in cases involving wilful misconduct, Oliver v. Calmar S.S. Co., D.C.D.Pa.1940, 33 F.Supp. 356, 1940 A.M.C. 411; Brock v. Standard Oil Co. of New Jersey, D.C.D.Pa.1940, 33 F. Supp. 353, 1940 A.M.C. 406; or where the injury results *solely* because of intoxication, Brock v. Standard Oil Co. of New Jersey, supra; Victoria v. Luckenbach Steamship Co., D.C.D.N.Y.1956, 141 F.Supp. 149, 151, 1956 A.M.C. 1626, affirmed per curiam, 2 Cir., 1957, 240 F.2d 349, 1957 A.M.C. 497; Barlow v. Pan Atlantic Steamship Corp., 2 Cir., 1939, 101 F.2d 697, 698, 1939 A.M.C. 483; The S.S. Berwindglen, 1 Cir., 1937, 88 F.2d 125, 1937 A.M.C. 347; Lortie v. American-Hawaiian S.S. Co., 9 Cir., 1935, 78 F.2d 819, 821, 1935 A.M.C. 1178; Meyer v. Dollar S.S. Line, 9 Cir., 1931, 49 F.2d 1002, 1003, 1931 A.M.C. 1059.[7]

With respect to the conduct of Stone, two significant facts stand out; (a) the respondent had combatted the claim of unseaworthiness with evidence that drinking and fighting were common occurrences among sailors generally and on the vessel in question in particular, and that respondent was not negligent in employing, or continuing in its employment, Plyler, since he was of a disposition equal to men of his calling (Jones v. Lykes Brothers Steamship Co., Inc., 2 Cir., 1953, 204 F.2d 815, 817, 1953 A.M.C. 1010, certiorari denied 1953, 346 U.S. 857, 74 S.Ct. 72, 98 L.Ed. 370, rehearing denied 1953, 346 U.S. 905, 74 S.Ct. 217, 98 L.Ed. 404, motion to file second petition for a rehearing denied 1955, 348 U.S. 960, 75 S.Ct. 447, 99 L.Ed. 749; Boudoin v. Lykes Brothers Steamship Co., Inc., 1955, 348 U.S. 336, 340, 75 S.Ct. 382, 99 L.Ed. 354, 1955 A.M.C. 488); and (b) the respondent did not offer any log entry to the effect that Stone's injuries were due solely to intoxication. Accordingly, the court finds as a fact and concludes as a matter of law that Stone's injuries were not due *solely*[8] to intoxication, and were not the result of wilful disobedience; and that therefore he is not barred from maintenance and cure on either of these grounds.

■ Stone at the time of the trial had only 20/200 vision in his left eye. This without dispute was permanent. Whether he also had traumatic epilepsy was a matter seriously in dispute. It was agreed that if he did, this also was permanent. While it is possible that in time Stone's previous history of injuries and his drinking habits might have produced the same conditions, the court finds as a fact that the injuries Stone received on January 20, 1956 "triggered" or precipitated their incidence. Since they are

---

**6.** Perhaps the most extreme (to the present time) instance of injury while "in the service of the ship" was the allowance of maintenance and cure for injuries received by a sailor who in Yugoslavia had accompanied a "lady of the evening" to her room for non-platonic exercises, but who before their commencement, recanted, resisted payment on either an express or implied contract, and jumped through the window when a man suddenly appeared in a threatening attitude at the door of the room. Koistinen v. American Export Lines, Inc., 1948, 194 Misc. 942, 83 N.Y.S.2d 297, 1948 A.M.C. 1464.

**7.** The Meyer case did not involve any element of drinking. Libellant, while off duty and taking recreation engaged in a "good-natured scuffle" in the course of which his leg was injured. The court held that libellant "by his own volition created an extraneous circumstance; he brought about an intervening cause that directly affected his relation to his employers and to the ship." The court attempted to analogize "in the service of the ship" with "in the line of duty" as applied to the Armed Forces, and affirmed the denial of recovery. It is at least doubtful if the Supreme Court decisions heretofore cited would now justify any such limited construction of "in the service of the ship" to a sailor on board and subject to call.

**8.** Were it significant, the court would find that Stone's drinking was *a* but not the *sole* factor in the fight and resulting injuries.

permanent in nature, however, they are not the occasion at this time for allowance of maintenance and cure. Farrell v. United States, 1949, 336 U.S. 511, 69 S.Ct. 707, 93 L.Ed. 850.

█ Stone's psychiatrist testified by deposition that he had first examined Stone on January 3, 1958, at which time (in addition to findings of impaired vision and traumatic epilepsy) he found "a severe anxiety state" and concluded that Stone "will require psychoneurotic care for the remainder of his life." Later he stated "From the standpoint of his anxiety state, he should get well within a period of a couple of years." Sedatives and anti-convulsive drugs were prescribed. He was seen by the psychiatrist again on January 24, 1958, February 3, 1958, February 24, 1958, March 24, 1958, May 22, 1958, June 23, 1958, July 30, 1958; and March 4, 1959.

The respondent's neurosurgeon examined Stone twice, and testified in court: He doubted the existence of traumatic epilepsy, but thought that if it did exist, it would probably be attributable to the numerous head injuries received before January 20, 1956. His diagnosis was "post-concussion syndrome"; a condition very difficult to treat; he did not know of any cure from a medical point of view. The court accepts the testimony of this specialist, whom it saw and heard in preference to that in the deposition of Stone's psychiatrist;[9] and therefore finds that this condition likewise is not the subject of maintenance and cure at this time.

█ Stone was hospitalized on the ship, in Aruba, and in Galveston, Texas, from January 20, 1956 to March 13, 1956. He was afraid that the authorities in the Galveston United States Public Health Service would "send him to a crazy house" so he flew to Washington, D. C., and then came to the United States Public Health Service Hospital in Baltimore, Maryland where he was an inpatient March 15, 1956 to May 25, 1956; July 13, 1956 to July 20, 1956; and November 13, 1956 to November 23, 1956. He was directed to return on December 6, 1956 for check-up. He did not return, was given another appointment on December 11, 1956 which he did not keep, and another for December 20, 1956, which likewise was not kept. His next appearance at the hospital was on February 1, 1957, when he came to the medical clinic and asked for a refill of sleeping tablets. He was asked to wait, or return after lunch for an examination. He left, saying he would go to another doctor. His next return was October 9, 1957, when he appeared, complaining of dizzy spells and falls. He was treated on an emergency basis for the falls. On November 29, 1957, March 19, 1958, April 10, 1958 and June 9, 1958 he was also treated on an emergency basis for injury from falls.

From the medical testimony, it is extremely doubtful that Stone needs psychiatric treatment, or that such treatment would be effective. However, the court finds that Stone's unjustified refusal to report to and to accept treatment

9. Stone's psychiatrist, in support of his opinion that Stone's condition found on examination, was attributable to the January 20, 1956 incident, laid great emphasis on the absence of any trouble with his left eye before January 20, 1956, or any history of anything like his present complaints. On cross-examination he was correctly told that in 1944 Stone had had a head injury with post-concussion syndrome, and in 1952 another head injury with impairment of vision. This did not lead him to change or qualify in the least his opinion attributing to the January 20, 1956 incident, solely, the conditions found.

Further, although Stone's counsel was careful to have the psychiatrist state that Stone had been referred to him not merely for examination, but for treatment, he gave no indications that he had treated Stone, on any of the nine visits, for the anxiety neurosis, or had referred him for treatment. The "couple of years" period for clearing it up therefore loses all significance. It certainly lends no support to the contention of Stone's counsel that the period should run from, and maintenance and cure continue from, November 29, 1959—the date the deposition was taken.

at the local United States Public Health Service Hospital in December, 1956, the intentional nature of which is established by the incident of February 1, 1957, disqualifies him from any allowance of maintenance and cure at the least beyond the latter date. The Bouker No. 2, 2 Cir., 1917, 241 F. 831, 835, certiorari denied 1917, 245 U.S. 647, 38 S.Ct. 9, 62 L.Ed. 529; Dobbs v. Lykes Bros. Steamship Co., Inc., 5 Cir., 1957, 243 F.2d 55, 1957 A.M.C. 767, certiorari denied 1957, 355 U.S. 835, 78 S.Ct. 56, 2 L.Ed.2d 46, affirming D.C.D.La.1956, 140 F.Supp. 732.[10] Stone's only attempt to justify generally, but without reference to the specific instances, his failure to report for treatment is his counsel's argument that as Stone did not live in Baltimore City, he could not afford to report. Not only is there no evidence to support this attempted excuse; the evidence is directly to the contrary.[11]

In view of the admonitions as to the liberality with which claims of seamen are to be considered, the court will treat maintenance and cure as terminating on February 1, 1957—the date of Stone's affirmative and unequivocal refusal to accept the services of the United States Public Health Service—rather than the December, 1956 incidents, which are negative in character.

While the case was being investigated, respondent paid Stone maintenance through June 8, 1956. It is also entitled to credit for nineteen days (July 13, 1956 to July 20, 1956; November 13, 1956 to November 23, 1956—first and last days included of in-patient treatment). Maintenance and cure are therefore due for 219 days at $8 per day (daily rate stipulated) or $1,752. Let a decree be entered accordingly.

The foregoing embodies the findings of facts and conclusions of law of the court under Admiralty Rule 46½, 28 U.S.C.A. Should either or both parties desire other, further or more detailed findings, they may be submitted within ten days.

---

10. Note the reference to the obligation of one in Stone's position to minimize damages, and to prove by a preponderance of the evidence, what if any periods of outpatient care were necessary; evidence as to which the record is silent.

11. Stone testified that even in 1958 he was not eligible for treatment at the Johns Hopkins Hospital free clinic because he had money.

During the trial, some question arose as to whether Stone, because of requirements as to periods of service, would have been eligible for treatment at the United States Public Health Service Hospital indefinitely. The testimony, however, established to the court's satisfaction, and it so finds, that if Stone had reported from time to time as directed, he would have continued to receive treatments until his maximum improvement had been reached.