**Edwin TORRES, Plaintiff,**

v.

**M/V FUIONO FISHING VESSEL, Caribbean Fishing Company, Inc., Starkist Foods, Inc., Does 1–50, Defendants.**

**No. CIV. 98–828.**

United States District Court,
S.D. California.

Feb. 1, 2001.

Frederick Martin Dudek, Dougherty, Hildre, Dudek & Haklar, San Diego, CA, for Plaintiff.

John Whelan, Keesal, Young and Logan, Long Beach, CA, for Defendant.

## FINDINGS OF FACT AND CONCLUSIONS OF LAW

RHOADES, District Judge.

### I. Overview

Plaintiff Edwin Torres was severely injured during an altercation with a fellow crew member, Eneliko Lui, aboard the M/V Fuiono. Plaintiff filed suit against Defendants M/V Fuiono, Caribbean Fishing Company, and Starkist Foods, Inc., alleging four causes of action: (1) willful failure to pay maintenance and cure bene-

fits; (2) unseaworthiness; (3) Jones Act negligence; (4) general negligence. These claims were tried before the Court from November 28, 2000, through December 12, 2000. Pursuant to Federal Rule of Civil Procedure 52(a), the Court sets forth below its findings of fact and conclusions of law.

## II. Findings of Fact and Conclusions of Law

### A. Findings of Fact

1.  The Fisherman's Night Club is a bar in Samoa. From 1995 to 1999, Eneliko Lui ("Lui") was ejected from this bar four or five times. Lui caused disturbances in the bar only when he was drunk. On one such occasion, Lui pulled a knife on and threatened the bar's bouncer while he was ejecting Lui from the club. When the bouncer armed himself with rocks, Lui ran away from him.

2.  In March, 1997, Lui was a crew member aboard the M/V Golden Glow. Carlos Jimenez was a cook aboard the ship. Thomas Zolezzi was the ship's captain. Lui, who was drunk at the time, became enraged because Jimenez would not provide him food. Lui punched Jimenez twice in the face and slammed him into a wall. After the first punch, Captain Zolezzi entered the ship's cafeteria and stopped the fight. After stopping the fight, Lui struck Jimenez again in Zolezzi's presence. Zolezzi fired Lui when the ship reached port because of his conduct.

3.  Fights aboard fishing boats are rare occurrences. Although tempers often flare and crew members argue, they hardly ever come to blows. According to Captain Zolezzi, who has sixteen years of experience in the fishing industry and ten as a captain, he has witnessed only one or two fights aboard ship. Plaintiff's expert witness, Norman Mezin, also stated that fights aboard fishing ships are extremely rare.

4.  Lui striking Jimenez in front of Captain Zolezzi showed great disrespect for the captain. Aboard ships, crew members must respect and obey the captain's orders for the safety of the ship and fellow crew members.

5.  Defendant Caribbean Fishing Company ("Caribbean") owned and operated the M/V Fuiono at the time of the incident at issue here. Caribbean is a subsidiary of Defendant Starkist Foods, Inc. Wages of M/V Fuiono crew members were paid by Starkist Samoa, Inc., another subsidiary of Starkist Foods, Inc.

6.  One position aboard fishing ships is the deck boss. Typically in the fishing industry, the ship captain hires the crew with the deck boss assisting him. Plaintiff Edwin Torres ("Plaintiff") and Lui were not hired in this way, however. They were hired by Caribbean's general manager (Carlos Sanchez) to do repair work on the Fuiono, which was dry-docked at the time in Singapore. Sanchez hired them with the promise that they stood a good chance of being hired as crew members aboard the Fuiono. Subsequently, they were hired as crew members in November, 1997, without the involvement of the Fuiono's captain because, while it was dry-docked, the Fuiono had no captain. Although it is unclear who actually hired Plaintiff and Lui, the Court finds that the deck boss (Carlos Jimenez) and ship captain (Steve Ribeiro) ratified the hiring by allowing

them to remain aboard. Thus, the Court finds that the Fuiono's deck boss and ship captain were at least partially responsible for hiring Plaintiff and Lui.

7. Carlos Jimenez told Jorge Espinoza that Lui had punched him aboard the Golden Glow in 1997. Jimenez did not tell Espinoza that Lui had punched him in front of the captain. Espinoza did not relay this information to others involved in hiring the Fuiono's crew. He also did not ask Lui about the fight because he had worked with him before on another fishing vessel and, based on this experience, concluded that Lui did not pose a threat of violence aboard the Fuiono.

8. Plaintiff and Lui had a quarrelsome relationship. Plaintiff was a poor and careless worker aboard the Fuiono, sometimes leaving out tools instead of returning them to their proper place; placing a boat battery next to a fuel line; and sometimes not working very hard. When members of the crew (including Lui) corrected Plaintiff for doing things improperly, Plaintiff would take umbrage and become angry at them.

9. The Fuiono, like many fishing boats, used a smaller speed boat to help catch fish. Plaintiff drove the speed boat and guarded his position jealously. He believed that Lui, who also was a speed boat driver, wanted to take his job. When Lui told him not to place the speed boat's battery next to the fuel line, Plaintiff pulled out his fishing knife, blade open, and threatened to kill Lui.

10. Plaintiff was pugnacious with other crew members as well. One week before threatening Lui, Plaintiff threatened crew member Feagai Faaogea with his knife after Faaogea told him to stop being lazy. Plaintiff lost his temper, pulled out his fishing knife, and gestured it towards Faaogea. Plaintiff also threatened crew member Ernesto Quado with a power tool after Quado refused to give Plaintiff a picture of the crew.

11. Before the incident at issue here, Captain Ribeiro was aware of at least one argument between Plaintiff and Lui.

12. Lui told two crew members, Taaloga Sauiluma and Ernesto Quado, that he would hurt Plaintiff so badly that he would never be able to fish again if Plaintiff did not stop threatening him. According to Defendants, Lui told this threat to Quado, a friend of Plaintiff, so Quado would tell Plaintiff of this and Lui would thereby avoid another confrontation with Plaintiff. Yet Lui also told this threat to Sauiluma, who had no such relationship with Plaintiff. Based on this, the Court finds that Lui did plan to harm Plaintiff before the incident if they had another confrontation.

13. On the day of the incident, both Plaintiff and Lui were on deck. Lui was in the crow's nest looking for fish; Plaintiff was working on the speed boat. Lui asked Plaintiff to relieve him in the crow's nest. Plaintiff refused. Lui then climbed down from the crow's nest, went below deck and into the head. Plaintiff followed him.

14. The Court finds that Plaintiff was the physical aggressor of the fight. In the head, Plaintiff without provocation began yelling at Lui. Lui walked out of the head and into the passageway. Plaintiff followed

him. Plaintiff pulled a knife on Lui. Lui had his back turned to Plaintiff. Sauiluma, who was also in the passageway, saw Plaintiff pull out the knife. He yelled to Lui to look out, that Plaintiff had a knife. As Lui turned, Plaintiff's hand moved towards him.

15. Lui grabbed Plaintiff's arm holding the knife, pressed it against the head door, and punched Plaintiff in the jaw. This blow knocked Plaintiff to the deck, rendering him almost unconscious. According to two witnesses, Hector Sanchez and Taaloga Sauiluma, Plaintiff was not holding a knife after he fell to the deck. Thus the Court finds that when Plaintiff fell to the deck, the knife was no longer in his hand. The Court finds that Lui's testimony to the contrary is not credible.

16. After falling, Plaintiff rolled from his side to his back. Lui grabbed a railing along the hallway for leverage and stomped Plaintiff's head three or four times with his tennis shoes. While Lui stomped Plaintiff's head, Plaintiff's only movement was an attempt, at first, to cover his head with his hands. Plaintiff took no actions to fight Lui after being knocked down. Plaintiff made no attempt to get up. Nevertheless, Lui continued to stomp Plaintiff after he had stopped moving. Lui stopped after he heard Hector Sanchez yelling at him to stop. The stomping lasted three or four seconds. After stopping, Lui then picked up Plaintiff's knife and left the passageway. Other members of the crew then took Plaintiff to a shower to wash him. Lui then entered the passageway leading to the shower; he was holding an iron bar, weighing

approximately five pounds. Sanchez met Lui at the entrance to the shower and prevented him from entering it. The Court finds that Lui came to kill or further injure Plaintiff with the iron bar because he asked Sanchez for Plaintiff's whereabouts while holding the bar.

17. The Court finds that Lui used more force than was necessary to defend himself from Plaintiff. Lui's punch rendered Plaintiff's almost unconscious. Lui no longer had the knife in his hand once he fell to the deck. Despite this, Lui continued to stomp on Plaintiff's head. Plaintiff's only movement during this time was to cover his head from Lui's stomps.

18. In determining whether Lui's initial response to Plaintiff's assault was reasonable, the Court notes that eyewitness accounts of the fight differ as to whether the knife blade was open or closed, and whether Plaintiff was attempting to stab Lui or simply trying to take the knife out of his pocket. These discrepancies concern subtle distinctions which are insignificant in the context of a knife fight. Plaintiff had a knife in his hand and his hand was moving towards Lui. The Court cannot expect Lui to make subtle factual distinctions such as whether the knife blade was open or closed when his life was threatened. Moreover, the Court has examined a knife similar to Plaintiff's. The handle is shiny like a blade. So even if closed, it could appear open.

19. The Court finds that Lui feared for his life at the beginning of the incident and this fear at first was rea-

sonable. However, after knocking out Plaintiff with a punch to the face and one stomp, the Court finds that Lui no longer feared for his life; any such fear would have been unreasonable anyhow. Plaintiff no longer had the knife in his hand after the first punch; he was lying on his back and no longer resisting Lui's blows.

20. This conclusion is bolstered by the size discrepancy between Plaintiff and Lui. At the time of the incident, Plaintiff was 5'5" and weighed approximately 120 lbs.; Lui was 5'11" and weighed approximately 195 lbs. Lui had experience as a boxer. Given this, the Court finds that Lui's testimony that he feared for his life throughout the incident is not credible.

21. The Court finds that Lui's initial response (punch and first stomp) was "in the heat of passion." However, once Plaintiff fell to the deck, he was almost unconscious and no longer had the knife in his hand. At this point, Plaintiff posed no threat to Lui. Lui's continued stomping past this point was not "in the heat of passion." Rather Lui was carrying out his threat to beat Plaintiff so that he would never fish again. That Lui was not in the "heat of passion" at this point is clear from his actions after he stopped stomping Plaintiff: Lui had the presence of mind to grab Plaintiff's knife and take it to the Fuiono's captain to show him that he had acted in self-defense in beating Plaintiff. Such presence of mind is not characteristic of someone responding "in the heat of passion."

22. The Court finds that Lui was not affected by the Body Alarm Response (BAR) phenomena as described by Dr. Anthony Semone. According to Dr. Semone, BAR causes people to lose rational control of their voluntary behavior, to experience distorted or loss of auditory information, to lose manual dexterity, and to have their emotions dominate their thinking. Lui showed no signs of BAR. He stopped stomping Plaintiff after hearing Sanchez yelling at him. He immediately picked up Plaintiff's knife to take to the Captain to show that he acted in self-defense. Plaintiff had no loss of manual dexterity: he grabbed a railing along the hall way to balance himself while he stomped Plaintiff's head. Thus, BAR did not cause Lui to continue stomping Plaintiff's head after Plaintiff no longer posed a threat to him.

23. The Court finds that Lui continued to stomp Plaintiff's head after Plaintiff no longer threatened him because he lost his temper. Lui admitted to Hector Sanchez that he had lost his temper during the incident.

24. Lui's blows severely damaged Plaintiff. Plaintiff's face and skull were fractured in seventeen places. Plaintiff required emergency surgery to repair a subdural hematoma and the facial fractures.

**B. Conclusions of Law**

1. Plaintiff's injuries occurred aboard the M/V Fuiono while at sea. Both Plaintiff and Lui were seamen aboard the Fuiono. Jurisdiction in this case is based on the Court's general admiralty and maritime jur-

isdiction. *See Grubart v. Great Lakes Dredge & Dock Co.,* 513 U.S. 527, 115 S.Ct. 1043, 130 L.Ed.2d 1024 (1995).

2. Plaintiff asserts four causes of action for damages against Defendants: willful failure to provide maintenance and cure; Jones Act negligence; negligence; unseaworthiness

## Willful Failure to Provide Maintenance and Cure

3. Under general maritime law, a seaman who falls ill or becomes injured while in the service of a ship is entitled to "maintenance and cure." *See Gardiner v. Sea-Land Serv. Inc.,* 786 F.2d 943, 945–46 (9th Cir.1986). This right includes (1) "maintenance," a living allowance for food and lodging; (2) "cure," reimbursement for medical expenses; and (3) "unearned wages," from the onset of injury until the end of the voyage. *See id.* at 946. The purpose of this right is to protect "poor and improvident seamen," encourage shipowners to protect the seaman's safety, and induce employment in the merchant marine. *See id.*

4. Although Defendants' duty to pay maintenance and cure is not affected by Plaintiff's negligence, this duty is not absolute. *See* Schoenbaum, *Admiralty and Maritime Law,* § 4–28 at 291–92 (2d ed.1994). Where the seaman's injuries are the result of

his own willful misconduct, he is not entitled to compensation. Willful misconduct includes fistfights initiated or provoked by the injured seaman. *See Fountain v. John E. Graham & Sons,* 833 F.Supp. 873 (S.D.Ala.1993).

5. Whether Plaintiff's involvement in the fight with Lui terminates Defendant's maintenance and cure obligations depends on Defendant proving two facts: (a) Plaintiff was the physical aggressor in the fight, *see Gulledge v. United States,* 337 F.Supp. 1108, 1112 (E.D.Pa.1972), *aff'd,* 474 F.2d 1340 (3d Cir.1973); and (b) no more force than necessary was used to repel the assault, *see id.; see also Jones v. United States,* 1974 A.M.C. 955; *Stone v. Marine Transport Lines, Inc.,* 1960 A.M.C. 748. Courts draw broadly a shipowner's liability for maintenance and cure. *See Vaughan v. Atkinson,* 369 U.S. 527, 531, 82 S.Ct. 997, 8 L.Ed.2d 88 (1962). Typically, the seaman's misbehavior must be the sole cause of his injuries. *See* Schoenbaum, *supra,* § 4–28.

6. The Court finds that Plaintiff was the physical aggressor in the fight. Plaintiff pulled a knife on Lui and gestured it towards him.

7. To determine whether Lui used more force than necessary, the Court must first determine whether Lui was privileged to hit Plaintiff under the self-defense doctrine.[1] If

1. In attempting to broaden the scope of the self-defense privilege to include Lui's acts, Defendants rely on cases discussing self-defense in the criminal context. (*See* Def.'s Cont. Law and Fact, ¶¶ 49–51, 54.) The Court finds, however, that it is appropriate in this case to rely on principles of tort law when analyzing the scope of Lui's self-defense privilege. Plaintiff is bringing suit for damages in maritime law. The purpose of these damages is to compensate him for his injuries. This purpose is similar to that of tort law. *See* Prosser, *infra,* § 2, at 7. The purpose of criminal law, on the other hand, is protecting the public at large and therefore is less applicable to this case. *See* Prosser, *in-*

Lui was privileged, then Lui and Defendants are not liable for the damages caused by these blows. An assault victim is privileged to use force to defend himself where (a) he is not the aggressor; (b) he reasonably and actually believes that he is in immediate danger of harm to himself; (c) he used only such force as was or appeared reasonably necessary to protect himself. *See* Prosser & Keeton, *Torts,* § 19 (5th ed.1984). Defendant carries the burden of proving these elements. *See* Prosser, *supra.*

8. The Court finds that Lui actually and reasonably believed that Plaintiff posed a danger of harm to him before Lui knocked Plaintiff to the deck and stomped him once. Plaintiff had a knife in his hand; that knife blade was or appeared open; Plaintiff was moving the knife towards Lui. However, once on the deck, Plaintiff no longer had the knife in his hand and therefore no longer posed a threat to him.

9. The Court finds that Lui used more force than was or appeared reasonably necessary to defend himself from Plaintiff. Lui's punch knocked Plaintiff to the deck and rendered him almost unconscious. Plaintiff's only movement was an attempt to cover his face from Lui's stomps. At this point, he had no knife in his hand. Yet Lui continued to stomp Plaintiff even after he ceased moving and no longer posed a threat to him. The Court recognizes that "[a] belief which may be unreasonable in cold blood may be actually and reasonably entertained in the heat of

passion." *Inge v. United States,* 356 F.2d 345, 348 (D.C.Cir.1966). However, Lui stomped Plaintiff two or three times after he posed no threat to him. Once Plaintiff was disarmed and helpless, Lui's privilege to use force ended. *See* Prosser, *supra.* Moreover, Lui's judgment was not so clouded during this altercation, for immediately after he stopped stomping Plaintiff, he had the presence of mind to pick-up the knife to bring to the Fuiono captain as evidence that he had acted in self-defense.

10. The Court recognizes that the distinction it draws is a subtle one: between one stomp being reasonable but more than one being unreasonable. If it is not possible to separate harm done by the use of unreasonable force from that done by reasonable force, then the defendant is liable for all of the harm done by the means used. *See* Prosser, *supra,* (citing *Restatement (Second) of Torts,* § 7, cmt. b (1965)). Here, the Court has found that Lui was privileged to stomp Plaintiff once, but after this first stomp, Lui should have stopped. However, if this distinction is too subtle and, in fact, it is impossible to separate the harm done by reasonable versus unreasonable means, then the Court follows the default position in tort law and finds that Lui (and Defendants) are liable for all of the harm done by Lui stomping Plaintiff. *See* Prosser, *supra.*

11. The Court finds that Plaintiff was not the sole cause of his injuries.

---

*fra.* Although self-defense in criminal and tort law are closely analogous, they sometimes yield different results. Where they do,

(*see, e.g.,* ¶ 10, p. 8, of this Order), the Court will rely on the tort law version.

Plaintiff is responsible for the injuries he received from Lui's punch and first stomp. However, Lui's subsequent stomps exceeded his self-defense privilege. Plaintiff was not responsible for the injuries caused by these extra stomps. Thus, because Plaintiff was not the sole cause of his injuries, he is entitled to maintenance and cure.

11.5. The Court finds that Plaintiff is not entitled to attorney's fees incurred to recover maintenance and cure benefits. Where a ship owner willfully and arbitrarily fails to pay maintenance and cure, he is responsible for paying the plaintiff's attorney's fees incurred to recover maintenance and cure. *See Kopczynski v. The Jacqueline,* 742 F.2d 555, 559 (9th Cir. 1984). If there is reasonable uncertainty as to whether a seaman is entitled to maintenance and cure, a ship owner's refusal to pay it is not willful or arbitrary. *See id.* (uncertainty over the plaintiff's status—whether he was a seaman entitled to maintenance and cure, or a longshoreman not entitled to maintenance and cure—supported the jury finding that the defendant's failure to pay maintenance and cure was not unreasonable).

Here, Plaintiff instigated the fight with Lui: he threatened to kill him and pulled a knife on him. If Lui's entire response to Plaintiff's threat was covered by the self-defense privilege, then Plaintiff would have been the sole cause of his injuries and Defendants would not have owed Plaintiff maintenance and cure. Until trial, however, it was uncertain whether Lui's response fell entirely under the self-defense privilege. Given this uncertainty, Defendants did not act unreasonably in not paying Plaintiff maintenance and cure until the Court determined that Plaintiff was not the sole cause of his injuries. Thus, Plaintiff is not entitled to attorney's fees.

**Unseaworthiness Claim**

12. A shipowner has a duty to a seaman employed on the ship to provide a vessel and equipment that are reasonably fit for their intended uses. *See Lee v. Pacific Far E. Line,* 566 F.2d 65, 67 (9th Cir.1977). This duty is akin to strict liability. *See Gulledge,* 337 F.Supp. at 1111. Included within this is the duty to provide a crew that is adequate and fit. *See Pashby v. Universal Dredging Corp.,* 608 F.2d 1312, 1313–14 (9th Cir. 1979). A crewman with a hidden propensity for violence may render a ship unseaworthy in the same way as a latent defect in the ship's equipment. *See Smith v. American Mail Line Ltd.,* 361 F.Supp. 1110, 1111–12 (W.D.Wash.1973). Indeed, a seaman with a propensity for violence may be a more deadly risk than a rope with a weak strand. *See Boudoin v. Lykes Bros. SS Co.,* 348 U.S. 336, 339–40, 75 S.Ct. 382, 99 L.Ed. 354 (1955). Where there is a fight between seamen, the Supreme Court has articulated a specific standard by which to measure the fitness of the seamen involved in the fight:

Was the assault within the usual and customary standards of the calling? Or is it a case of a seaman with a wicked disposition, a propensity to evil conduct, a savage and vicious nature?

If it is the former, it is one of the risks of the sea that every crew takes.

*Id.* at 339, 75 S.Ct. 382.

13. Courts look to a number of factors to determine whether a seaman's conduct rises to the level of savagery or viciousness necessary to render a vessel unseaworthy: (a) provocation, *see Palmer v. Apex Marine Corp.,* 510 F.Supp. 72, 73 (W.D.Wash.1981); (b) severity of injury, *see Boorus v. West Coast Trans–Oceanic Ship Line,* 299 F.2d 893, 896 (9th Cir.1962); (c) prior and subsequent acts of violence, *see Kirsch v. United States,* 450 F.2d 326, 327 (9th Cir.1971); (d) use of weapons, *see Boudoin,* 348 U.S. at 337, 75 S.Ct. 382; (e) physical differences, *see Stechcon v. United States,* 439 F.2d 792, 793 (9th Cir.1971); (f) a planned attack or intent to kill, *see Thompson v. Coastal Oil Co.,* 119 F.Supp. 838, 843 (D.C.N.J.1954), *rev'd* 221 F.2d 559 (3d Cir.1955), *rev'd,* 352 U.S. 862, 77 S.Ct. 90, 1 L.Ed.2d 73 (1956).

14. Before applying these factors to this case, the Court should address a stereotype that pervades the case law on unseaworthiness. The shipowner's duty is to provide a seaworthy crew has been characterized as requiring a crew "equal in disposition and seamanship to ordinary men in the calling." *Keen v. Overseas Tankship Corp.,* 194 F.2d 515, 518 (2d Cir.1952) (Hand, J.). Judge Hand, in *Jones v. Lykes Bros. S.S. Co.,* describes a very low standard of behavior for seaman, writing that "all men are to some degree irascible... [but] ... sailors lead a rough life and are more apt to use their fists than office employees; what will seem to sedentary people ... an insufficient provocation ... is not the measure of the 'disposition' of 'the ordinary men in the calling.'" 204 F.2d 815, 817 (2d Cir.1953). Judge Hand's caricature has been described as an "unfortunate choice of words." Lyle C. Cavin, Jr., *The Unseaworthiness Doctrine and Seaman's Assault: Navigating the Muddy Waters,* 18 Golden Gate U.L.Rev. 1, 16 (1988). It relies on no statistical or case authority. *See* Cavin, *supra.* Indeed, in this case, the Court heard from three witnesses with extensive experience in the fishing industry, Captain Thomas Zolezzi, Norman Mezin, and Carlos Sanchez. Each testified that violence aboard boats rarely occurs. Thus, at least in the fishing industry, it is inappropriate for courts to view with a blind-eye violence aboard fishing ships. What remains of Judge Hand's caricature, however, is the heavy burden Plaintiff still must carry to show unequal disposition. *See Boorus,* 299 F.2d at 895; *see generally,* Cavin, *supra.*

15. Turning to the first factor of unseaworthiness, provocation, the Court finds that it favors Defendants. It is clear from the record that Plaintiff provoked the attack by following Lui to the Fuiono's bathroom and then pulling out his knife and gesturing it towards Lui.

16. The second factor, severity of the injury, favors Plaintiff. Lui's blows fractured Plaintiff's skull and facial bones in seventeen places and left him unconscious for eighteen hours. Where a seaman's assault is particularly brutal, this brutality in itself may support an inference of vi-

ciousness of the assailant. *See Smith v. American Mail Line Ltd.,* 361 F.Supp. 1110, 1114 (W.D.Wash. 1973); *see also Clevenger v. Star Fish and Oyster Co.,* 325 F.2d 397 (5th Cir.1963).

17. The third factor, prior and subsequent acts of violence, favors Plaintiff. First, aboard the M/V Golden Glow, Lui struck the ship's cook. Violence like this aboard fishing ships is rare. The gravity of this act was magnified by it occurring in front of the ship's captain. Such conduct is unheard of and is evidence of Lui's unequal disposition. It is analogous to an attorney punching opposing counsel in front of a judge. Although Lui was drunk at the time, this does not erase the inference that he has an uncommon propensity for violence when he is sober. Just as people who are drunk still know better than to assault another person in front of a policeman, so too a drunk sailor should know better than to assault a fellow crew member in front of the captain. Second, after stomping Plaintiff and leaving the scene, Lui sought out Plaintiff with an iron bar but was stopped by Hector Sanchez. The Court infers from this that Lui intended to further beat Plaintiff. This intent to do more harm provides further evidence of Lui's unequal disposition.

18. The Court distinguishes *Kirsch* from the present case. Defendant interprets *Kirsch* to mean that a "prior incident [of violence] is not sufficient, as a matter of law, to establish unseaworthiness." (Def. Cont. Law and Fact ¶ 39). In *Kirsch,* the defendant had been involved in three prior fistfights ten years before the incident at issue.

*See* 450 F.2d at 327. None of them, nor a fight subsequent to the one at issue there, involved more than fisticuffs. *See id.* Here, however, the incident aboard the Golden Glow occurred less than a year before the Fuiono incident. Moreover, Lui has done more than use his fists during a fight. He pulled a knife on the bouncer at the Fisherman's Night Club when the bouncer ejected him from the club.

19. The fourth factor, use of weapons, also favors Plaintiff. Lui stomped Plaintiff's head with his shoes. An object need not be inherently dangerous to be considered a weapon in a fight. *See, e.g., Gulledge,* 337 F.Supp. at 1111 (discussing use of coffee mug as a weapon). How the defendant uses the object can make it dangerous. *See id.* Here Lui used his shoes like a weapon to crush Plaintiff's skull and face. He braced himself on railing in the passageway and stomped Plaintiff's head on a hard deck (steel covered with linoleum).

20. The fifth factor, physical differences, favors Plaintiff. At the time of the assault, Plaintiff was 5'5", 120 lbs.; Lui was 5'11", 195 lbs. Lui had experience as a boxer. Given the obvious differences in size and skill, Plaintiff was no match for Lui once he had been disarmed. *See Stechcon,* 439 F.2d at 793.

21. The sixth factor, a planned attack, favors Plaintiff. Lui told at least two crew members that he would hurt Plaintiff so that he would never fish again if Plaintiff continued threatening him. Planning to seriously harm a fellow crew member

indicates a savage and vicious disposition. *See Thompson,* 119 F.Supp. at 843 (assailant rendered ship unseaworthy where he armed himself with a meat cleaver, hid in a dark doorway from which he later attacked the plaintiff, striking his head three times with the cleaver).

22. Based on the above six factors, the Court finds that Lui possessed a disposition unequal to that of the ordinary seaman aboard fishing vessels. This difference in disposition rendered the Fuiono unseaworthy.

**Jones Act Negligence and Negligence**

23. To recover under either Jones Act or general maritime law for negligence, Plaintiff has the burden of showing that Defendants (1) were negligent in either hiring Lui or taking no steps to prevent further confrontations between Plaintiff and Lui once Captain Steve Ribeiro (the Fuiono's captain) became aware of a previous argument between them; and (2) this negligence was a proximate cause of Plaintiff's injuries. *See In re Hechinger,* 890 F.2d 202, 208–09 (9th Cir. 1989).

24. The Court finds that Defendants were not negligent in hiring Lui because the incident was not foreseeable based on the deck boss' knowledge of the Golden Glow incident. The only person with knowledge of Lui's conduct aboard the Golden Glow was the Fuiono's deck boss. Although he was partially responsible for hiring the ship's crew, he only knew that Lui had been involved in a fight, not that it had occurred in front of the Golden Glow's captain. Moreover, he had worked with Lui before and did not think he was violent. Using his personal experiences in this way to discount rumors of Lui's fight aboard the Golden Glow was not unreasonable.

25. The Court finds that Captain Ribeiro was not negligent in taking no steps to prevent further confrontation between Plaintiff and Lui. As Captain Zolezzi testified, tensions often flare up at sea, but hardly ever lead to violence. Because arguments rarely lead to violence, it was not foreseeable that the animosity between Lui and Plaintiff would lead to violence.

**Damages**

26. The parties have bifurcated this case. The Court's task is to determine liability and apportion damages according to each parties' relative fault. *See Kopczynski,* 742 F.2d at 558. The Court has found that Defendants' are liable only for maintenance and cure and for unseaworthiness; Plaintiff has failed to carry the burden of proof on his other causes of action.

27. The Court finds that damages should be allocated at 50% for each party. The Court derives this percentage after carefully considering the parties conduct; the Court is not simply "punting" a difficult decision. Plaintiff's damages are reduced by 50% because he was the initial aggressor. He pursued Lui from the crows nest to the head; he pulled a knife on Lui. He had been warned by friends not to antagonize Lui, yet he continued to do

so. Defendant's liability results from Lui continuing to stomp Plaintiff after he no longer posed a threat to him. After Lui punched Plaintiff and Plaintiff fell to the deck, he no longer had the knife in his hand. He made no attempt to attack Lui at this point. Yet Lui continued to stomp Plaintiff.

28. The Court need not determine which Defendants are responsible for paying maintenance and cure versus damages for unseaworthiness. According to Defendants, they are willing to allow judgment to be entered against both of them jointly and severally. (*See* Def.'s Resp. Decl. Dudek, 2.)

IT IS SO ORDERED: