Carol J. MACKE, Plaintiff,

v.

**MISSISSIPPI BELLE II, INC., Defendant.**

**No. CIV.3–00–CV–10074.**

United States District Court, S.D. Iowa, Davenport Division.

March 11, 2002.

David R. Treimer, Davenport, IA, Dennis M. O'Bryan, Howard M. Cohen, John E. Drumm, O'Bryan Law Center PC, Birmingham, MI, for Plaintiff.

E. David Wright, Norman Gilloon & Wright, Dubuque, IA, Kimbley Kearny, Michael E. Zidek, Clausen Miller PC, Chicago, IL, for Defendant.

## ORDER

LONGSTAFF, Chief Judge.

The Court has before it Defendant Mississippi Belle II, Inc.'s ("MBII"), motion for partial summary judgment (Clerk's No. 35) and supporting brief filed November 30, 2001. Plaintiff Carol Macke filed a resistance and a supporting brief on January 9, 2002. The motion is now considered fully submitted.

Macke filed the present action on May 12, 2000. Macke asserts causes of action for negligence under the Jones Act, 46 App.U.S.C. § 688(a), and for unseaworthiness, maintenance and cure, and wages, under general maritime law. Macke seeks to recover damages for personal injuries sustained during the course and scope of her employment as a seaman.

In its present motion, Macke seeks summary judgment on plaintiff's claims of negligence under the Jones Act, and for unseaworthiness under general maritime law.

## I. BACKGROUND

The following facts are undisputed or are viewed in the light most favorable to Macke, the non-moving party. MBII operates a river gaming casino in Clinton, Iowa. MBII employed Macke from July 26,

1996, to August 27, 1999, as a customer service representative in the casino's Players' Club.

The Players' Club is a small area enclosed by three walls and on the fourth side, patron-service windows, which open the Players' Club to public view. The Players' Club sits adjacent to turnstiles through which patrons access the boarding ramp leading to the casino vessel. An attendant always stands at the turnstiles.

Inside the Players' Club, the open work space contains one space divider, a few open cubicles, and the department manager's office. Players' Club representatives sit at computer terminals at a counter facing the patron windows and turnstiles. Typically, at least three Players' Club workers and four guest-services employees work at the counter. Immediately behind the counter runs a walkway where people can walk behind the Players' Club representatives and guest-services workers, without making physical contact with them.

For approximately the last two years of Macke's employment, one of her female co-workers, 23–year–old Rustie Knutsen, was assigned to supervise Players' Club employees when the regular supervisor, Cindy Fullick, was not on duty. The record does not disclose Macke's age, but one co-worker described her as "elderly." (DeCamp Dep. at 34.) Macke stated in deposition that Knutsen verbally abused her.

Sometime in July 1999, Macke walked into an office where Knutsen was talking to a casino "pit boss," Lori Dennis. Macke alleged that while she was behind Dennis, Knutsen deliberately slammed her left shoulder into Macke's right shoulder as hard as she could, knocking Macke into a bookcase. Plaintiff reported the assault to another Players' Club representative, who in turn confronted Knutsen.

On or about July 22, 1999, Macke reported the incident to Randy Tompkins, human resources director; Gayla Haferbier, supervisor of guest services; and Fullick, plaintiff's main supervisor. Macke asserts that Fullick responded, "I know how mean Rustie is to you and I am going to [Anna Skomp, Macke's department manager] with it." (Macke Dep. at 56.) Fullick, however, told Macke that Skomp would not do anything about the situation. Fullick later denied ever making the above statements to Macke. Macke also reported Knutsen's assaults to supervisors Shawn Burden, Fran White, and Chris Quick.

MBII's employee handbook does not address how to conduct an investigation into one employee's allegations that she was assaulted by another employee. Nevertheless, MBII holds all employees accountable for following and enforcing the Iowa Racing and Gaming Commission ("IRGC") Rules. These Rules, which are published by the IRGC and enforced by the Iowa Division of Criminal Investigation ("DCI"), require MBII employees to report to the DCI any improper incidents or situations for investigation. DCI maintains an office in Clinton and another on board the MBII staffed with four gaming enforcement officers ("GEOs") and two special agents. GEOs initiate and conduct investigations, and make arrests when necessary. Under IRGC's and MBII's rules, MBII employees must cooperate with GEOs during investigations. GEO Adam DeCamp stated he had investigated approximately four or five assaults at MBII during the past five years.

All MBII employees are held accountable for the IRGC Rules. Despite this fact, however, Knutson's alleged assault of Macke was not reported to DCI. Rather, Macke's supervisors conducted their own investigation. Tompkins interviewed Haferbier, Fullick, Skomp, Burden, White, and Quick, none of whom verified Macke's alle-

gations. Tompkins admitted she had no training on how to investigate an alleged assault. Skomp interviewed Dennis, whom Macke identified as an eyewitness. Dennis, a good friend of Knutsen, told Skomp that she did not see Knutsen shove Macke into a bookcase.

A few days after the first incident, Macke was standing at the Players' Club counter when Knutsen again deliberately struck Macke as hard as she could with her shoulder. Macke had tried to move out of the way. Macke reported the second assault to Tompkins, who said, "Do you really think [Knutsen] knows what she is doing?" (Macke Dep. at 74.) Macke said yes, Knutsen knew. Macke also reported Knutsen's actions to Fullick and said that other employees were probably working at the counter when the assault occurred, although she did not remember who was present. Neither Tompkins nor Fullick reported Macke's allegations to DCI investigators.

Macke alleged that on August 12, 1999, Jim Tigges, a payroll department employee, and Knutsen were walking in the Players' Club toward Skomp's office, when Knutsen deliberately slammed her shoulder as hard as she could into Macke, who was at the counter. Macke had leaned back against the counter to avoid being hit. Frustrated that nothing had been done to stop Knutsen's previous assaults, Macke left work early. Burden followed Macke as she was leaving and asked Macke to tell Tompkins what had happened When Macke replied, "Randy won't listen to me," (Macke Dep. at 92), Burden indicated she would report to Tompkins what had happened. At the store that night Macke saw Fullick, who said, "you get back [to work] tomorrow, it is okay." (Macke Dep. at 93.) Macke said, "Well, I walked. If you walk you are fired." (Macke Dep. at 93.) Fullick said, "I don't care, I know what goes on. I know what happens, it is not your

fault. You get back to work tomorrow morning." (Macke Dep. at 93.) The next day Macke returned to work and was not disciplined for leaving work early the previous day.

Tompkins interviewed Tigges twice regarding the events that occurred on August 12, 1999, and both times Tigges denied seeing Knutsen hit Macke. Tompkins also interviewed Fullick and Burden, and both women denied ever seeing Knutsen strike Macke. Neither Tompkins nor any other supervisor reported the alleged assault to DCI investigators.

Macke alleged that on or about August 22, 1999, Knutsen hit Macke with her shoulder as hard as she could, while Macke was standing at the Players' Club counter. Macke reported this incident to Tompkins and said that as a result of Knutsen's assaults, "I am hurting so bad I cannot sleep at night," and that she had to go to a doctor. (Macke Dep. at 101.) Tompkins did not report Macke's allegations to DCI investigators. As a result of injuries she received from being hit by Knutsen, Macke went to a doctor for treatment on August 23, 1999.

Tompkins and Skomp each questioned Knutsen about her alleged assaults on Macke, and both times Knutsen denied ever making physical contact with Macke. Tompkins and Skomp also had frequent opportunities to observe Knutsen, and they never saw Knutsen act in a manner to suggest she might physically assault anyone. Macke, however, stated she had seen Knutsen make a fist to strike another employee.

Macke claims that several times when she was sitting at the service counter in the Players' Club, Knutsen would open a metal drawer and purposely strike Macke's leg with the drawer, causing pain and bruising. Macke also claims that Knutsen shoved a chair into her back.

Macke reported Knutsen's actions to her supervisors, but was unable to name anyone who witnessed Knutsen's acts.

Skomp asserts that she interviewed the people in Macke's department who were at work when Macke said Knutsen assaulted her. No employee told Skomp they had seen Knutsen assault Macke. Skomp spoke with all employees who worked in the Players' Club and who might know about an altercation between Knutsen and Macke, and told them that if they saw Knutsen behave improperly toward Macke in the future, they were to notify her immediately. No one ever reported such an incident before Macke resigned. Macke believes her co-workers did not report seeing Knutsen's assaults because they were afraid of losing their jobs. Skomp did not notify DCI investigators about Knutsen's alleged actions.

Macke stated that sometime between August 22 and August 27, 1999, Knutsen deliberately struck Macke as hard as she could with her shoulder near the Players' Club counter. Macke reported this assault to Tompkins, who did not notify DCI investigators. After this assault, MBII offered to transfer Macke to another department. She declined the offer because it included a pay decrease. Macke asserts that when she reported Knutsen's assaults to Skomp, the supervisor told Macke "to get tough skinned," laughed, and told Macke to hit Knutsen back (Macke Dep. at 115.) Shortly after the assault, Macke resigned.

GEO DeCamp began investigating Knutsen's alleged assaults on or about November 22, 1999, after a casino employee told him about Knutsen's assaults on Macke. DeCamp and GEO Bret Braafhart interviewed several MBII staff members, including Knutsen.

Knutsen admitted that she hit one of her co-workers, Theresa Katzenburger, on November 1, 1999, after she became frustrated during a disagreement. Knutsen told DeCamp that she hit Katzenburger because she was mad and she hits people when she gets mad. Knutsen also told the officers that she "gets frustrated very easily." (DeCamp Dep. at 21.) She then admitted that she "could have gotten frustrated," on the days when Macke said the assaults occurred. (DeCamp Dep. at 21.) Knutsen said that when she gets frustrated, "I zone out," and has trouble controlling her anger. (DeCamp Dep. at 21.) Knutsen also admitted that she had "told a lot of lies." (DeCamp Dep. at 23.) DeCamp testified he did not view any surveillance videos to gather evidence of the alleged assaults, because MBII does not keep surveillance videos that long before erasing them. Knutsen told DeCamp that Macke would not have singled her out to cause trouble.

On November 29, 1999, DeCamp and Braafhart interviewed Fullick, who supervised Knutsen, Katzenburger, and Macke. DeCamp stated that Fullick said: (1) Knutsen had no ability to deal with stress and did not get along well with other employees; (2) Knutsen would "go ballistic" if an employee or patron "kept after her about something"; (3) Knutsen told Fullick she felt like a "volcano" and she was afraid she was going to hurt someone; (4) Fullick did not believe Knutsen had anger-management skills; and (5) the reason Fullick had failed to contact the DCI about Macke's allegations was because Fullick thought the DCI was on board the MBII to regulate gaming issues, not employee problems. Fullick denies making these statements to DeCamp.

DeCamp interviewed Macke's chiropractor, Dr. Roy Lubkeman, who had been treating Macke's injuries. Dr. Lubkeman provided DeCamp a treatment summary. DeCamp learned that Macke had sustained a dislocated rib. The information rein-

forced DeCamp's opinion that the force that caused Macke's rib injury was substantial.

GEO John Taylor interviewed Stu Hoover, an IRGC representative, at DeCamp's request The IRGC focuses on the administrative penalties and functions as they relate to gaming, whereas the DCI focuses on criminal penalties. Hoover had interviewed Knutsen to decide what, if any, administrative penalties should be imposed against her for her actions while employed with MBII. Knutsen admitted to Hoover that she had been both verbally and physically intimidating other employees; she had escalated verbal and physical harassment into a physical altercation with Katzenburger; and she had pushed Macke out of anger and frustration, not self-defense.

Knutsen entered into a stipulation with IRGC dated December 9, 1999, including the following admission: "From August [19]99 through September [19]99, Knutsen committed a violation of Commission rules by both verbally and physically harassing other employees while on Boat property. [Knutsen] admits to initiating aggressive behavior towards two fellow employees' [sic] which includes physical altercation. This conduct is of a disorderly nature and is undesirable." (Pl.'s Ex. F.) Under the stipulation Knutsen paid a $50 fine. MBII asserts that Knutsen entered into the stipulation only because IRGC agreed that, if she paid the fine, she would not lose her gaming license or job. As a result of Knutsen's actions toward Katzenburger and Macke, MBII stripped Knutsen of her supervisory job and demoted her.

A warrant was issued for Knutsen's arrest for assaulting Macke. On December 20, 1999, Knutsen turned herself in to the Clinton County Attorney's Office. She pleaded no contest to the criminal assault charges.

## II. ANALYSIS

### A. Summary Judgment Standard

A court shall grant a motion for summary judgment only if there is no genuine issue of material fact in dispute and the moving party is entitled to judgment as a matter of law. Fed.R.Civ.P. 56(c); *Celotex Corp. v. Catrett*, 477 U.S. 317, 322–23, 106 S.Ct. 2548, 91 L.Ed.2d 265 (1986). A court must consider the facts and the inferences to be drawn from them in the light most favorable to the nonmoving party. *Matsushita Elec. Indus. Co. v. Zenith Radio Corp.*, 475 U.S. 574, 587, 106 S.Ct. 1348, 89 L.Ed.2d 538 (1986), *Kindred v. Northome/Indus. School Dist. No. 363*, 154 F.3d 801, 803 (8th Cir.1998), *cert. denied*, 525 U.S. 1109, 119 S.Ct. 881, 142 L.Ed.2d 781 (1999).

To preclude the entry of summary judgment, the nonmovant must make a showing sufficient to establish the existence of every element essential to his case, and on which he has the burden of proof at trial. *Celotex*, 477 U.S. at 322–23, 106 S.Ct. 2548; *Reed v. ULS Corp.*, 178 F.3d 988, 989 (8th Cir.1999). When a motion is made and supported as required in Federal Rule of Civil Procedure 56(a), the adverse party may not rest upon the mere allegations or denial in his pleadings, but must set forth specific facts showing there is a genuine issue for trial. Fed.R.Civ.P. 56(e); *Celotex*, 477 U.S. at 324, 106 S.Ct. 2548. At the summary judgment stage, the court may not make determinations about the credibility of witnesses or the weight of the evidence. *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 249, 106 S.Ct. 2505, 91 L.Ed.2d 202 (1986). Where inconsistent inferences can reasonably be drawn from undisputed evidentiary facts, it is for a jury rather than the courts to decide which reasonable inference to draw. *Ryther v. KARE* 11, 108 F.3d 832, 845 (8th Cir.) (en

banc), *cert. denied,* 521 U.S. 1119, 117 S.Ct. 2510, 138 L.Ed.2d 1013 (1997).

## B. Jones Act Negligence Claim

Macke alleges that her employer, MBII, was negligent under the Jones Act, because it continued to employ Knutsen, even after the casino knew or should have known that she had a propensity toward violence.

A seaman who suffers injury in the course of employment due to the negligence of his employer, the vessel owner, or crew members may seek recovery under the Jones Act. *Lewis v. Lewis & Clark Marine, Inc.,* 531 U.S. 438, 441, 121 S.Ct. 993, 148 L.Ed.2d 931 (2001). In order to establish a claim of negligence under the Jones Act, a plaintiff must show: (1) the employer owed the plaintiff a duty; (2) the employer breached that duty; and (3) a causal link between the plaintiff's injury and the employer's breach. *See Frederick v. Harvey's Iowa Management Co., Inc.,* 177 F.Supp.2d 933, 938 (S.D.Iowa 2001). Under the Jones Act, the employer and shipowner have a duty to use reasonable care to furnish seamen a safe place to work. *Yehia v. Rouge Steel Corp.,* 898 F.2d 1178, 1184 (6th Cir.1990). The threshold showing for causation in a Jones Act case is low. The "verdict must stand if 'the proofs justify with reason, the conclusion that employer negligence played any part, even the slightest, in producing the injury or death.'" *Alholm v. American Steamship Co.,* 144 F.3d 1172, 1178 (8th Cir.1998) (quoting *Ferguson v. Moore–McCormack Lines, Inc.,* 352 U.S. 521, 523, 77 S.Ct. 457, 1 L.Ed.2d 511 (1957), *Rogers v. Missouri Pac. R.R. Co.,* 352 U.S. 500, 506, 77 S.Ct. 443, 1 L.Ed.2d 493 (1957)).

In the present case, the parties do not dispute the first element of negligence under the Jones Act: that MBII owed a duty of care to Macke. Rather, the fighting issue is whether MBII's actions or inaction resulted in a breach of its duty to Macke. To establish a breach of duty, Macke must show that MBII "knew, or by the exercise of due care should have known, that prevalent standards of conduct were inadequate to protect [Macke] and other similarly situated employees." *Frederick,* 177 F.Supp.2d at 939 (quoting *Urie v. Thompson,* 337 U.S. 163, 174, 69 S.Ct. 1018, 93 L.Ed. 1282 (1949)). In determining whether an employer in the exercise of due care "should have known" of a danger, an analysis of whether the injury was "reasonably foreseeable" is required. *Id.* An employer is not liable for failing to provide a safe workplace if no reasonable way exists of knowing a potential hazard exists. *Id.* Therefore, for Macke to prevail on her negligence claim, she must show that prior to one or more of the assaults, MBII, knew or should have known that in her supervisory role, Knutsen posed a danger to Macke.

The record indicates Macke repeatedly told supervisors about specific deliberate assaults by Knutsen, her supervisor. At least one supervisor knew about Macke's medical treatment for an injury allegedly inflicted by Knutsen. The supervisors Macke informed did not avail themselves of the investigative expertise of DCI officers. The MBII supervisors conducted their own investigation of a fellow supervisor, despite their lack of training in assault investigations.

Viewing the evidence in the light most favorable to Macke, the Court holds she has produced sufficient evidence to raise a material question of fact concerning whether MBII knew or should have known that Macke was in danger of assault from Knutsen.

## C. Unseaworthiness Claim

Macke also argues that due to Knutsen's multiple assaults on Macke,

MBII was an unseaworthy vessel. "To be seaworthy, a vessel must be reasonably fit for its intended purposes." *Frederick v. Harvey's Iowa Management Co., Inc.*, 177 F.Supp.2d 933, 940 (S.D.Iowa 2001). A plaintiff may recover on an unseaworthiness claim as a result of injuries from a seaman "with a proclivity for assaulting people, if the seaman has 'a wicked disposition, a propensity to evil conduct, a savage and vicious nature,' such that the ship becomes a perilous place, but not if the assault was 'within the usual and customary standards of the calling.'" *Boudoin v. Lykes Brothers S S Co., Inc.*, 348 U.S. 336, 339–340, 75 S.Ct. 382, 99 L.Ed. 354 (1955).

Courts look to a number of factors to determine whether a seaman's conduct rises to the level of savagery or viciousness necessary to render a vessel unseaworthy: (a) provocation, (b) severity of injury, (c) prior and subsequent acts of violence, (d) use of weapons, (e) physical differences, and (f) a planned attack or intent to kill. *Torres v. M/V Fuiono Fishing Vessel*, 141 F.Supp.2d 1028, 1038 (S.D.Cal.) (holding vessel was unseaworthy; defendant had disposition unequal to that of ordinary seaman aboard fishing vessels) (internal citations omitted), *rev'd*, 2002 WL 188946, 30 Fed.Appx. 752 (9th Cir.2002) (noting defendant did not provoke fight but was reacting in self-defense to plaintiff's unprovoked knife attack). The assailant's disposition should be judged, not by the injury in fact inflicted, "but by what would ordinarily follow from what he did." *Jones v. Lykes Bros. Steamship Co., Inc.*, 204 F.2d 815, 817 (2nd Cir.1953) (stating one fist fight would seldom result in serious injury).

MBII argues that because of the relatively mild nature of Knutsen's conduct, Macke has not produced sufficient evidence to generate a jury question concerning whether Knutsen had "a wicked disposition, a propensity to evil conduct, a

savage and vicious nature." *See Boudoin v. Lykes Brothers S S Co., Inc.*, 348 U.S. at 340, 75 S.Ct. 382. This Court agrees. Although Knutsen's attacks on Macke admittedly were unprovoked, neither Knutson's character, nor the assaults themselves, rise to the level of "savagenous" necessary to render a vessel "unseaworthy." *See Walters v. Moore–McCormack Lines, Inc.*, 309 F.2d 191, 193 (2nd Cir.1962) (seaman must have "savage and vicious nature," causing ship to become "perilous place") As noted by one federal district court:

> Cases which have found that a seaman has a savage disposition based on the fact that the assailant savagely and without provocation attacked the plaintiff inevitably contain an egregious assault quite different from the scuffle in this case. Cases which hold the shipowner liable are, without exception, cases where the assailant uses a deadly weapon or dangerous instrument in the assault.

*Fountain v. John E. Graham & Sons*, 833 F.Supp. 873, 881 (S.D.Ala.1993); *see also Smith v. Lauritzen*, 356 F.2d 171 (3d Cir. 1966) (evidence showed shipmate attacked with cargo hooks); *Clevenger v. Star Fish & Oyster Co.*, 325 F.2d 397, 402 (5th Cir. 1963) (fellow seaman stabbed decedent 62 times, inflicting some wounds after decedent was no longer able to defend himself). Summary judgment is therefore granted on plaintiffs unseaworthiness claim.

### III. CONCLUSION

For the foregoing reasons, Defendant's Motion for Partial Summary Judgment (Clerk's No. 35) is denied with regard to plaintiff's Jones Act negligence claim, and granted with regard to her unseaworthiness claim under general maritime law.

IT IS SO ORDERED.